# Illinois Official Reports

## Appellate Court

***Bangaly v. Baggiani*, 2014 IL App (1st) 123760**

| | |
|---|---|
| Appellate Court Caption | SYLLA BANGALY, Administrator of the Estate of Hawa Sissoko, Deceased, Plaintiff-Appellant, v. ALFRED C. BAGGIANI, Individually and as Agent and Employee of Roadway Express, Inc., a Delaware Corporation; ROADWAY EXPRESS, INC., a Delaware Corporation, n/k/a YRC, a Wholly Owned Subsidiary of YRC Worldwide, Inc., a Delaware Corporation; and YRC WORLDWIDE, INC., a Delaware Corporation, Defendants-Appellees (Noumouke Keita, Intervenor-Appellant). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-12-3760, 1-13-0624, 1-13-0729 cons. |
| Filed | September 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a wrongful death action arising from the fatal injuries suffered by plaintiff's decedent, an immigrant from the African country of Mali, when she was struck by a truck on a tollway, the trial court did not err in vacating the $4.25 million judgment against defendants on behalf of decedent's parents and siblings and dismissing the case in its entirety upon learning that decedent was married at the time of her death, since defendants learned of the possibility of an issue as to the proper heirs of decedent's estate just prior to trial, and although their pretrial request to postpone the trial and conduct further discovery was denied, they renewed their efforts after the trial, and the trial court ultimately found that decedent was married and that her surviving husband was her sole heir, and then the trial court vacated the judgment against defendants, dismissed the case with prejudice, removed plaintiff as the representative of decedent's estate, denied the request of decedent's husband to be named as administrator in place of plaintiff, denied his request to amend the complaint and found both decedent's family and her surviving husband had engaged in fraud on the court, and upon appeal by plaintiff and decedent's husband, all of the trial court's decisions were upheld, save the denial of the surviving husband's request for leave to amend the complaint, which was reversed. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-002542; the Hon. Daniel J. Lynch, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | William J. Harte, of Chicago, for appellant Sylla Bangaly. |
| | Christopher Keleher, of Keleher Appellate Law Group, LLC, of Chicago, and Erik B. Lutwin, of Lutwin & Lutwin, LLP, of New York, New York, for appellant Noumouke Keita. |
| | C. Barry Montgomery, Alyssa M. Reiter, and Hanson L. Williams, all of Williams, Montgomery & John, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. Presiding Justice Palmer and Justice Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1    This is a unique wrongful death case of first impression where a jury returned a verdict of $4.25 million against defendants on behalf of the decedent's parents and eight siblings, and the trial court vacated the judgment on the verdict after hearing that the decedent was married at the time and then dismissed the case in its entirety. The decedent, Hawa Sissoko, a 28-year-old immigrant from the African country of Mali, was killed when a tractor trailer truck driven by defendant Alfred Baggiani struck her on the Indiana Tollway. Plaintiff Sylla Bangaly,[1] in his capacity as the administrator of Sissoko's estate, filed a wrongful death action against Baggiani, his employer Roadway Express, Inc., and Roadway Express's parent company, YRC Worldwide, Inc. After a jury trial, the jury found defendants liable for Sissoko's death, awarding the estate $4.25 million in damages, and the trial court entered judgment on the verdict.

---

[1]We refer to "Bangaly" when discussing the actions of plaintiff Bangaly in his capacity as the administrator of Sissoko's estate. During points of the proceedings below, Bangaly had a criminal attorney representing him individually; however, any actions of Bangaly individually are not at issue in the instant appeal.

¶ 2        However, immediately prior to trial, defendants had discovered a potential issue with the wrongful death action, namely, who were the proper heirs to Sissoko's estate? The wrongful death action was brought on behalf of Sissoko's parents and eight siblings, based on an order of heirship entered by the probate court finding that Sissoko's parents and siblings were her only heirs; the order of heirship was in turn based on Bangaly's affidavit of heirship, in which he stated that Sissoko was never married. However, shortly before trial, defendants discovered that Sissoko may in fact have been married at the time of her death, to intervenor Noumouke Keita, a New York cabdriver whom she purportedly married via a proxy marriage in their home country of Mali. After an investigation by Bangaly's counsel, Bangaly produced a divorce decree sent from Sissoko's father in Mali purporting to show that Sissoko was divorced at the time of her death. Defendants sought to postpone the trial date to conduct further discovery as to the validity of the divorce decree but that request was denied and the matter proceeded to a jury trial.

¶ 3        After the trial, defendants renewed their request and filed a motion asking for postjudgment discovery concerning the issue of Sissoko's marriage. The trial court granted posttrial discovery to determine whether Sissoko and Keita were married at the time of her death. Initially, the focus of the marriage issue was the validity of the divorce decree; however, after Bangaly's expert concluded that the document was a forgery, Bangaly's focus shifted to the claim that Sissoko and Keita had never been legally married under Malian law. After a year of posttrial discovery, during which Keita for the first time intervened in the case,[2] the trial court found that Sissoko and Keita were validly married and that the marriage was in effect at the time of Sissoko's death. Accordingly, the trial court found that Keita was the sole heir to Sissoko's estate. After the finding as to heirship, defendants filed a posttrial motion asking the court to vacate the judgment in its entirety and to dismiss the case with prejudice.

¶ 4        The trial court vacated both the liability and damages portions of the wrongful death verdict, finding that the fact of Sissoko's marriage would have had a substantial effect on the case that defendants presented as to both liability and damages. The trial court also removed Bangaly as administrator of Sissoko's estate, finding that Bangaly had not been acting in the best interest of the estate, but denied Keita's request to be named administrator in Bangaly's place. Additionally, the trial court denied Keita's request to amend the complaint and instead dismissed the case with prejudice, finding Keita's latency inexcusable, and further found that Keita and Sissoko's family had engaged in a fraud on the court. The court based its fraud finding on evidence that the two families had concealed Keita's existence until it was no longer possible to do so, and also pointed to the divorce decree, which was found to be fraudulent, and found that Keita only appeared in the case when the theory of divorce was no longer feasible.

¶ 5        Both Bangaly and Keita appeal. First, Bangaly claims: (1) the trial court erred in permitting posttrial discovery; (2) the trial court erred in allowing the testimony of defendants' expert on Malian law and in its limitation on the testimony of Bangaly's expert; (3) the trial court's ruling that defendants rebutted the presumption that Sissoko's parents and siblings were her

---

[2]Keita filed a motion to intervene on August 8, 2012, during the course of posttrial discovery. The motion was entered and continued until it was granted on December 17, 2012, at the same hearing at which the trial court made its finding as to heirship. Keita filed no intervenor's complaint, but filed a motion to vacate the damages portion of the judgment and to remove Bangaly as the administrator of Sissoko's estate on January 7, 2013.

heirs, as well as its conclusion that Sissoko and Keita were validly married, was against the manifest weight of the evidence; and (4) the trial court's finding that there was a conspiracy to commit fraud was not supported by the evidence in the record. Additionally, Keita claims: (1) that the trial court erred in dismissing the case with prejudice as to Keita because he had no part in any fraud on the court and his intervention was timely; (2) that the jury verdict as to liability should stand; and (3) that Keita should have been permitted to amend the pleadings and to be appointed administrator of Sissoko's estate. For the reasons that follow, we affirm in part and reverse in part.

¶ 6                                                    BACKGROUND
¶ 7                                          I. Sissoko's Death and Her Estate
¶ 8        The underlying facts of Sissoko's death are undisputed and are not at issue on appeal. On May 30, 2007, Sissoko's vehicle was found stopped in the rightmost eastbound lane of I-80/90 near Chesterton, Indiana; Sissoko had exited the vehicle and was standing behind its trunk. Baggiani was driving a commercial tractor trailer truck loaded with nearly 27,000 pounds of freight eastbound down the same interstate in the course of his employment with Roadway Express. At approximately 11:10 a.m., Baggiani collided with Sissoko and her stopped vehicle, killing Sissoko instantaneously by crushing her between her vehicle and Baggiani's tractor trailer.

¶ 9        On November 21, 2007, Bangaly, Sissoko's paternal uncle, executed an affidavit of heirship, which stated that Sissoko's parents were both still living and that Sissoko had eight siblings. The affidavit of heirship further stated: "HAWA SISSOKO was never married and never had nor adopted any children during her lifetime." On the same day, the probate division of the circuit court of Cook County entered an order declaring that Sissoko's parents and siblings "are the only heirs of the decedent." On December 12, 2007, Bangaly was appointed independent administrator of Sissoko's estate.

¶ 10                                     II. Complaint and Pretrial Discovery
¶ 11       On December 27, 2007, Bangaly, in his capacity as administrator of Sissoko's estate, filed a lawsuit in state court in Indiana, alleging that Baggiani's negligent conduct caused Sissoko's death. The lawsuit was subsequently voluntarily dismissed, and on March 3, 2009, Bangaly filed the instant wrongful death lawsuit[3] against defendants in the circuit court of Cook County. The complaint alleges that Baggiani's negligent operation of the tractor trailer caused Sissoko's death and further alleges "[t]hat HAWA SISSOKO left surviving her parents Diaguila [sic] Sissoko and Goundo Dembele; and her brothers and sisters[,] *** all of whom are lawful heirs of the Estate of HAWA SISSOKO."

¶ 12       On December 7, 2009, Bangaly filed answers to written interrogatories propounded by defendants. In response to the interrogatory, "If the deceased was married at the date of death, state the date and place of such marriage and the name and address of the spouse of deceased," Bangaly answered, "The Plaintiff's decedent was not married as of the date of her death." In response to the interrogatory, "If the deceased has previously been married, state the name(s) and last known address(es) of the former spouse(s), the date(s) of the marriage(s) and the

_____

[3]The complaint also included a survival action, but defendants were granted summary judgment on that count on July 13, 2011, and it is not at issue on the instant appeal.

date(s) of separation and/or divorce," Bangaly answered, "The Plaintiff's decedent had not been previously married before her death."

¶ 13                                   III. Defendants' Discovery of Sissoko's Marriage

¶ 14        On October 31, 2011, approximately two weeks before the November 14, 2011, date scheduled for trial, defendants filed an emergency motion to dismiss the complaint pursuant to section 2-619(a)(9) of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619(a)(9) (West 2010)), or to strike the trial date. The motion claimed that while Bangaly had denied that Sissoko was ever married throughout his discovery responses, in fact, Sissoko had been married at the time of her death, as demonstrated by a marriage certificate found among Sissoko's personal belongings at the scene of the accident; defendants claimed that they had discovered Sissoko's marriage certificate on October 27, 2011, while preparing for the depositions of her parents.[4] Defendants claimed that if Sissoko was survived by a spouse, then her parents and siblings could not maintain a wrongful death action and therefore, asked for a section 2-619(a)(9) dismissal of the complaint. Alternatively, defendants asked for the trial date of November 14, 2011, to be stricken. On the same day, the trial court denied defendants' motion to dismiss, but struck the trial date.

¶ 15        On November 1, 2011, Bangaly filed amended answers to defendants' interrogatories, disclosing "Noubouka [sic] Keita" as a lay witness who "was the husband of Hawa Sissoko at the time of her death." Also on November 1, 2011, Bangaly filed a motion for leave to file an amended complaint to substitute "Noubouka [sic] Keita" as the sole heir of Sissoko's estate.[5]

¶ 16        On November 9, 2011, Bangaly's counsel produced a purported divorce decree for Sissoko and Keita, dated November 17, 2005.

¶ 17        On November 14, 2011, the trial court entered an order denying defendants' oral motion to take additional discovery as to the status of Sissoko's marriage and/or divorce and granting Bangaly's motion for leave to withdraw his motion for leave to file an amended complaint. Also on November 14, 2011, Bangaly filed additional amended answers to defendants' interrogatories, removing Keita as a witness.

¶ 18                                   IV. Defendants' Suspicions That Divorce Decree Is Fraudulent

¶ 19        On January 13, 2012, defendants filed an "Emergency Motion to Strike Trial Date and Allow Evidentiary Hearing Concerning Beneficiaries Based on Fraudulent Divorce Decree," requesting that the trial date of January 17, 2012, be stricken. The motion stated that upon defendants' discovery of Sissoko's marriage certificate in October 2011, they advised Bangaly's counsel, Lawrence Ruder, of the marriage. Ruder located Keita in New York City and brought him to Chicago to discuss the matter, and Keita informed Ruder that he and Sissoko were married at the time of her death. Accordingly, on November 4, 2011, Bangaly

---

[4]The partially burned document was in French and was originally labeled a "birth certificate" by an investigator retained by defendants shortly after Sissoko's death. According to the record, in preparing for the depositions of Sissoko's parents, a paralegal in defendants' counsel's office noticed that the document appeared to be a marriage certificate, not a birth certificate.

[5]Throughout the record, Bangaly's counsel states that he filed these documents as a precautionary measure while further investigating Sissoko's marital status.

filed a motion to amend the complaint to substitute Keita as the rightful heir, but received additional time to investigate the marriage issue before the motion to amend was ruled upon. Prior to the next court date, Bangaly advised Ruder that Sissoko and Keita had been divorced in 2005.

¶ 20 The motion stated that Bangaly produced a purported divorce decree on November 9, 2011, showing that Sissoko and Keita had divorced on November 17, 2005. The next day, defendants' counsel requested confirmation that Ruder did not represent Keita in light of the divorce, but Ruder responded that he did represent the interests of Keita and instructed defendants' counsel not to contact Keita unless it was through him. On November 14, 2011, when the parties next came before the court, defendants' request for additional discovery on the marriage and divorce issue was denied, and Ruder withdrew the motion to amend the complaint.

¶ 21 The motion further stated that upon receipt of the purported divorce decree, on November 11, 2011, defendants retained an attorney in Mali to obtain a copy of the divorce file and confirm the validity of the divorce. On January 6, 2012, the attorney advised defendants that no such file existed and that no divorce judgment was ever entered. Thus, defendants argued that it appeared that the divorce decree was fraudulent and, consequently, Sissoko was in fact married to Keita at the time of her death. Defendants requested time to conduct an evidentiary hearing so that the proper beneficiary could be identified and the pertinent witnesses deposed prior to trial.

¶ 22 On January 17, 2012, defendants' motion to strike the trial date was heard by Judge Solganick, who noted:

> "I find it interesting that the putative spouse hasn't sought to intervene. Even if the matter is tried and there's an issue as to who would take under the Wrongful Death Act; that is, if the decedent left a spouse to whom the decedent was still married to, that would be something for the trial judge to determine with regard to any distributions that might be had from the estate of the decedent *** or if the case would be settled with regard to any distributions, that may be an issue with regard to who would take or if the matter is raised at that point, at least the trial judge would have a duty to see that there might be a hearing at that time to see who would actually receive any benefits under the Wrongful Death Act."

The court defendants' motion to strike the trial date was denied and trial proceeded.

¶ 23                                            V. Trial

¶ 24 When the parties came before Judge Lynch for trial on January 17, 2012, defendants renewed their motion to strike the trial date. The court denied the renewed motion, stating:

> "The Court heard that Judge Solganick in Room 2005 this morning on the trial assigned the call and heard that same motion which was presented orally, or at least argued orally, and available for the judge, and a written copy of the motion tendered to the judge for his consideration; and he ruled on that, denying the motion. The Court also heard Judge Flanagan had earlier been asked to allow for additional discovery, namely, I think it was, a couple depositions on the subject; and she denied that motion on a previous date. And this Court denied the renewed motion and stands on the ruling it made after listening to arguments by both sides this morning before we broke."

¶ 25        Additionally, prior to trial, one of Bangaly's motions *in limine* asked the trial court "to bar any evidence or otherwise refer to Decedent's ex-husband, a prior marriage, her divorces, or other facts relating to her marital status, as such evidence is irrelevant to any fact at issue in this matter." In the motion, Bangaly argued that "[t]he fact Decedent may have been married or divorced is entirely irrelevant to the issues at hand–liability and damages. Decedent was not married at the time of the crash. The only issue that is relevant is that she was a single woman who left behind a mother and father and brothers and sisters at the time of her death." Defendants argued that such information was important because it bore directly on Bangaly's credibility, since he signed an affidavit and answered discovery stating that Sissoko was never married. Defendants also argued that it would change the damages portion of the case if there was 1 beneficiary as opposed to 10, and that they had been prevented from conducting discovery as to the validity of the divorce decree by the denials of their previous motions. The motion *in limine* was granted over defendants' objection. However, the trial court noted that "I'm not restricting the defense from asking that question [about Sissoko's marital status] or the plaintiff, for that matter, from asking questions about her marriage or her divorce or anything like that. It's just that I've made it clear that if you ask a question along the lines [of] isn't it true this is a fraudulent divorce decree, that would be an inappropriate question given the posture of the defense in the case. I've heard no witness that has come into court to prove up an[ ] answer to the contrary. And for you to do that would be allowing you to ring a bell that you are not able to prove and that appears to be a bad faith line of questioning."

¶ 26        At trial, no testimony was elicited about Sissoko's marital status. Bangaly's evidence at trial focused on Baggiani's conduct in driving his truck and his reaction to observing Sissoko in the road. The defense, by contrast, focused on the theory that Sissoko was committing suicide by standing in the traffic lane, facing east, and not moving when warned of oncoming traffic by a passing driver.

¶ 27        One of the jury instructions given at the trial instructed the jury: "The plaintiff, Sylla Bangaly, brings this action in a representative capacity by reason of his being administrator of the Estate of Hawa Sissoko, deceased. He represents Diaguili Sissoko, Goundo Dembele Sissoko, Makan Sissoko, Samah Sissoko, Mohamed Sagui Sissoko, Ramata Sissoko, Mohammed Sissoko, Fatoumato Sissoko, Miriam Dorothea Sissoko, and Assetou Sissoko, the next of kin of the deceased. They are the real parties in interest in this lawsuit, and in that sense are the real plaintiffs whose damages you are to determine if you decide for the administrator of the estate of Hawa Sissoko."

¶ 28        On January 24, 2012, the jury returned a verdict in favor of Sissoko's estate and against defendants, finding that the estate suffered $5 million in damages from loss of society. The jury further found that the percentage of negligence attributed to Sissoko was 15% and the percentage of negligence attributed to defendants was 85%, and reduced the estate's total damages to $4.25 million. On the same day, the trial court entered judgment on the verdict.

¶ 29                              VI. Request for Posttrial Discovery

¶ 30        On January 31, 2012, defendants filed a motion for limited posttrial discovery, based on the discovery of Sissoko's marriage to Keita and subsequent discovery shortly before trial that the purported divorce decree may have been fraudulent.

¶ 31        Attached to the motion was an excerpt from the January 9, 2012, discovery deposition of Diaguili Sissoko, Sissoko's father, in which Diaguili testified that Sissoko had married Keita in

Bamako, Mali, in 1998, a ceremony that Diaguili and Bangaly both attended. He further testified that Keita was not present at the ceremony, but that "[t]here was somebody representing Keita there"; he testified that this type of ceremony was common in Mali. The marriage between Sissoko and Keita was an arranged marriage, and Sissoko had never met Keita prior to the ceremony. After the ceremony, Sissoko moved to New York City, where she lived with Keita for three years and worked in a hair salon braiding hair.

¶ 32    On February 3, 2012, the trial court entered an order staying the execution of the judgment.

¶ 33    On February 9, 2012, defendants filed an amended motion for posttrial discovery and requested an evidentiary hearing. Defendants argued that an evidentiary hearing was necessary in order to determine the proper beneficiaries, and that the trial court's failure to ascertain the proper beneficiaries to a wrongful death suit required reversal of the resulting judgment. Defendants further argued that the evidentiary hearing was necessary due to the possibility that fraud had been committed with respect to the determination of the proper beneficiaries. Defendants also argued that Bangaly should be removed as administrator of Sissoko's estate due to his misrepresentations of her marital status and his loyalty to his family over the interests of Keita, and a neutral special administrator should instead be appointed.

¶ 34    In his response, Bangaly argued that the divorce decree was not fraudulent and that defendants lacked standing to challenge a probate court's determination of heirship. Attached to the response was the entirety of Diaguili's discovery deposition, which included Diaguili's testimony that Sissoko and Keita had divorced in 2005. Diaguili further testified that he was in possession of the divorce decree, which he obtained in Bamako, Mali, at the time of the divorce, and faxed to Bangaly in 2011. Diaguili was aware that Sissoko wanted a divorce, so he helped obtain an attorney to represent her in the divorce proceedings. Sissoko was not present in court during the divorce proceedings, but Diaguili was.

¶ 35    Also attached to the response was the deposition of Goundo Dembele Sissoko, Sissoko's mother. Goundo testified that Sissoko married at the city hall in Bamako in 1998, with Keita's brother representing him at the ceremony; she further testified that Bangaly was not present at the ceremony. After the ceremony, Sissoko moved to New York to live with Keita for several years. They divorced, and Sissoko moved to Chicago to live with Bangaly, Diaguili's younger brother.

¶ 36    On April 3, 2012, the trial court granted defendants' motion for posttrial discovery on the issue of heirship, noting that "there's obviously some questions here surrounding whether or not Hawa Sissoko was in fact married at the time of this incident, her death, and there's some questions about whether she was divorced or not divorced. Those are some significant issues in this case. I'm inclined to grant a hearing. I believe it's an appropriate situation to grant such a hearing." The court further stated:

> "[T]here's some questions here that need to be delved into and I think this is an appropriate case for postjudgment discovery on the issue. I would point out that as the trial judge here, I have to determine who should be getting these distributions. It's administered and accounted for perhaps in probate, but this Court makes determinations on liens and who the proper parties are to receive distributions in accordance with, you know, the damages that perhaps they suffered in the context of the case. So with that in mind, and with these questions in mind, I think it's not inappropriate–I think it would be an abuse of my discretion not to allow for some postjudgment discovery here."

The court entered a written order granting posttrial discovery on April 5, 2012.

¶ 37                    VII. The First Indication by Bangaly That the Validity of
                                    the Marriage Itself Is at Issue

¶ 38         On April 24, 2012, the following colloquy occurred between the parties and the court:

"THE COURT: It appears, I may be wrong, you can both correct me, that there is no dispute between the parties now that Hawa Sissoko has been married in the past. Am I correct in stating that?

She was married once before; is that correct, plaintiff?

BANGALY'S COUNSEL: As an officer of the court, I must advise you that we are not sure about that now.

DEFENSE COUNSEL: It's the first I've ever heard this. It has never been contested throughout any time that this was an issue. So I don't know where he's coming up with this, but it's contrary to everything that's ever been set forth.

THE COURT: So as an officer of the court, I mean, you can't tell me if Hawa Sissoko has ever been married before?

BANGALY'S COUNSEL: I cannot confirm to this court that the purported marriage in 1998 was legally recognized by Mali, the country of Mali. And we are investigating that ourselves."

At the same hearing, when discussing the upcoming discovery, the trial court indicated that with respect to the depositions of Keita and Bangaly,[6] the depositions should occur live, under oath, in the courtroom with the court present.

¶ 39         At a May 15, 2012, status hearing, defendants' counsel informed the court that he had been in contact with Keita's attorney in New York, who wished to meet with defendants and Bangaly for a settlement conference. At a May 22, 2012, status hearing, defendants' counsel informed the court that he had received an email from Bangaly's counsel indicating that Bangaly's position was "that the marriage never happened," and asked for clarification as to whether Bangaly had "dropped this issue that there was a divorce" and was solely focusing on the "new position" that there was no marriage. In response, Bangaly's counsel stated that "[t]he position of the estate is that Hawa Sissoko was not married at the time of her death" and that "we have been gathering evidence and speaking with people we have respect for that cast a doubt, a significant doubt, on the validity of this marriage. If that is the case, then whether or not there was some divorce decree put together in Mali by someone we don't know, it's moot. If she was not married ever, it doesn't matter what took place prior to the trial with respect to a divorce decree."

---

[6]The court was ultimately present for every deposition conducted during the posttrial discovery process. At the time of the court's statement, defendants were contemplating deposing several witnesses in Mali, which were ultimately determined to be unnecessary.

¶ 40                                VIII. Posttrial Discovery
¶ 41                                      A. Keita
¶ 42         On June 21, 2012, Keita appeared for his evidence deposition by a videoconference. Keita testified through an interpreter that he was born in Mali, but had lived in New York City for 15 years, driving a taxi. Keita testified that he married Sissoko in 1998; the ceremony took place in Bamako, Mali, but Keita was not present and his brother "acted as a groom." Keita testified that he signed a document[7] that permitted his brother to stand in for him at the marriage ceremony and "sen[t] it to him." After the marriage, "they" sent him a paper indicating that he was married. Keita testified that he was married to Sissoko at the time of her death.

¶ 43         Keita testified that Sissoko came to the United States to live with him in 2000. She left New York City for Chicago in 2005 because she was employed braiding hair and "[i]t was a busy time for hair braiding" in Chicago. When she moved to Chicago, she told Keita that "she was staying with Sylla's wife"; Keita did not know that "Sylla" was Bangaly until after Sissoko's death. Keita visited Sissoko five or six times in Chicago, and they spoke on the telephone every day. Keita was informed of Sissoko's death by "Sylla"; Keita did not know whether this "Sylla" was the same one with whose wife Sissoko was living. After her death, he flew to Chicago for 15 days.

¶ 44         Keita testified that he asked a friend in Chicago to look for a lawyer after Sissoko's death and to contact him "so even if I don't go, they could put my name on the case." An attorney was obtained, but Keita heard "that Sylla say Hawa was not married," and the first case eventually was "drop[ped]."[8] Keita asked his friend Thera to look for a new lawyer, and when a second lawyer was obtained, "Thera told Sylla when he was introducing the case to call me and he going to put my name on the case. And he told Thera–he told Thera Hawa was married, then she got divorced"; Bangaly also told Sissoko's parents that she and Keita were divorced. Keita testified that Bangaly "lied" because Keita and Sissoko were not divorced.

¶ 45         Keita testified that in 2011, he was in Chicago visiting Thera when he heard that people were saying that Sissoko was divorced. He and Thera went to visit Bangaly's attorney, Lawrence Ruder, to show him the marriage certificate to prove that Sissoko and Keita were married. Keita testified that the Ruder informed him that "[h]e changed the case to put [Keita's] name on it," but that later, "after he said that there was a divorce paper, it came after, he says he's no longer going to consider me part of the case." Ruder provided Keita with a "divorce paper" that Keita had never before seen. Keita testified that on November 15, 2005, the date listed on the "divorce paper," Sissoko was living with him in New York.

¶ 46         Keita testified that when Sissoko was living with him, the phone bill was in her name; Keita did not have any copies of the phone bill at the deposition. He further testified that they set up a bank account, but that he did not have copies of bank statements with her name because there was a fire at his apartment that burned any paperwork from that time period. Keita did identify several photographs of him and Sissoko taken between 2000 and 2005, an airplane boarding pass from a trip to Chicago to visit Sissoko in 2006, and a MoneyGram he

---

[7]The record indicates that Keita was unable to read or write French or English and had completed only five years of schooling.

[8]The "first case" referred to is presumably the complaint filed in Indiana state court, which was voluntarily dismissed.

sent to Sissoko in 2006.

¶ 47                                                    B. Bangaly

¶ 48        On June 28, 2012, Bangaly, through an interpreter, testified in an evidence deposition that his brother was Diaguili Sissoko, Sissoko's father, and that Sissoko lived with Bangaly and his wife when she moved to Chicago at the end of 2004. Bangaly testified that he assumed that Sissoko was not married "[b]ecause nobody told me that Hawa was married," but he did not ask her parents whether she was married. Bangaly testified that he attended the depositions of Sissoko's parents, which were conducted in a language he understood, but denied learning that there was a marriage ceremony in Mali and denied hearing Diaguili testify that Bangaly was present at the ceremony. Bangaly testified that he was unaware of the marriage ceremony in 1998 and did not attend it.

¶ 49        Bangaly testified that he originally retained an attorney in Indiana, but that attorney "gave me the file and told me he couldn't handle it." Bangaly then "went to the Malian community, and I informed them of the situation." He met Abraham[9] Thera, who went with Bangaly to hire Larry Ruder, the attorney representing the estate in the instant case. Ruder did not ask about Sissoko's marital status, and Bangaly "just gave him the file."

¶ 50        Bangaly denied knowing Keita or ever speaking with him. Bangaly testified that he did no investigation as to Sissoko's marital status, nor did anyone to his knowledge, "because no one told me she was married, and even her [sic] did not tell me she was married." Bangaly denied ever seeing a divorce decree with respect to a marriage between Sissoko and Keita.

¶ 51        Bangaly testified that Ruder contacted him in 2011 concerning Sissoko's marriage, but Bangaly "didn't do anything" and did not contact Sissoko's parents. Bangaly denied faxing a copy of the divorce decree to Ruder. Bangaly later testified that Ruder informed him of a meeting with Keita, who claimed to be married to Sissoko. After the meeting, Bangaly contacted Sissoko's parents to ask them if the was married. Diaguili informed Bangaly that "no, she is not his wife."

¶ 52                                                  C. Abraham Thera

¶ 53        On July 24, 2012, Abraham Thera testified at an evidence deposition that he was acquainted with Bangaly, whom he had met in Chicago, and assisted Bangaly in finding representation with Ruder. Thera was present during Bangaly's first meeting with Ruder; Ruder asked Bangaly if Sissoko was married and Bangaly informed him that she was not.

¶ 54        Thera testified that during summer 2011, he received a phone call from Keita, who introduced himself as Sissoko's husband and said he was calling "because he got a problem with Bangalay [sic]." A few weeks later, Bangaly called Thera and told him that someone from the trucking company had found a document saying that Sissoko was married. Thera called Ruder, who told him the same thing. Thera informed Ruder that he had received a phone call from Keita. Thera then located Keita's contact information and contacted him in New York, asking him to come to Chicago to meet with Ruder. Keita traveled to Chicago the next day, and Thera brought him to Ruder's office. Ruder asked Keita for proof of the marriage, and Keita provided Ruder with the marriage certificate and a few photographs.

---

[9]Thera's first name is spelled both Abraham and Ibrahin in the record.

¶ 55    Two days later, Ruder called Thera and asked him and Keita to come to Ruder's office. When they did, Ruder "sa[id] he's got a letter from Africa that said that they divorce, Hawa was divorced." Keita told Ruder that he was not divorced, and Thera "told Mr. Ruder–I said, [t]hat's a fake paper. It's not–that's not a real one." Thera testified that he had personal experience with forged documents and that "I was born in Mali and my country is very corruption country, all right? Money do everything over there. You give somebody money, they got–print it. They got those documents over there." After he spoke with Ruder, Thera called Sissoko's father; Thera had never spoken to him before, but received his contact information from Keita. Diaguili told Thera to "ask Keita" about the divorce. A few days later, Thera heard Bangaly say that he obtained the divorce decree from Mali.

¶ 56    On cross-examination, Thera testified that he asked Sissoko's family for 35% of whatever they recovered from the lawsuit, but he testified that "I'm not here for the money." Thera testified that he did not inform Keita that there was a trial in Sissoko's case and did not contact him after the jury verdict.

¶ 57    Immediately after Thera's deposition, defendants' attorney stated that, due to Bangaly's expert's conclusion that the divorce decree was fraudulent, contained in a report and affidavit tendered to defendants' counsel and the court, "I do not believe that it's necessary for me on behalf of my client to attempt to establish that this divorce decree is null and void. So the issue here then is simply is there evidence to substantiate that Hawa Sissoko and Mr. Keita were husband and wife at the time of her death. That's the sole issue remaining for [Y]our Honor." Bangaly's counsel replied that he "agree[d] with that. *** I agree that's the sole issue before [Y]our Honor." Thus, as of July 24, 2012, the validity of the divorce decree was no longer at issue, and the sole issue was the legal validity of the 1998 proxy marriage ceremony between Sissoko and Keita.

¶ 58                                    D. Susanna Wing

¶ 59    On August 2, 2012, Susanna Wing, Ph.D., testified in an evidence deposition as an expert witness on behalf of Bangaly on the issue of whether Sissoko and Keita were legally married at the time of Sissoko's death. Since her qualifications are at issue on appeal, we relate them in considerable detail. Wing testified that she had a Ph.D. in political science and was a tenured professor of political science at Haverford College, where she taught courses on political science and African politics. She testified that she had a bachelor's degree in international studies and French, and two master's degrees, in political science and African-area studies, after which she obtained her Ph.D. in political science; the topic of her dissertation was "constitutionalism and the rule of law in Mali," which she explained "mean[t] understanding how the legal system functions and justice functions in that country and the democratic system in existence in Mali at the time." She received a Fulbright fellowship and spent a year in Mali researching the topic of her dissertation. She was also awarded a Chateaubriand postdoctoral fellowship, which "is essentially the French government equivalent" of the Fulbright fellowship, and conducted research on legal pluralism in West Africa, including research involving constitutionalism and the legal system in Mali. She also did research on family law in Mali on behalf of the French National Center for Scientific Research and the Center for African Studies in Bordeaux, France, where she "was essentially speaking with women's associations, human rights lawyers, judges, about the Marriage Code in Mali in place at the time and debates and discussions around reforming that code, as well as the interaction

between the modern law, the civil law that I'm speaking about, and religious and traditional laws that governed people's actions also in the country." Wing had also been the recipient of a grant from the United States Department of State and did work for the Department of State involving an executive seminar, which was "essentially a debriefing for the incoming U.S. ambassador to a country," in this case, Mali.

¶ 60    Wing testified that she had published a number of articles concerning Mali, specifically Malian family law, and had also authored a textbook on democracy in Mali. Wing had also authored a number of articles in various textbooks and had been invited to numerous workshops and lectures to make presentations concerning Mali.

¶ 61    Wing testified that she was familiar with the Malian Marriage and Guardianship Code "[b]ecause since my work in 1994 began with women's associations, interested in women's rights, the Marriage Code that you've referred to, the 1962 Marriage Code, has been the fundamental document regarding women's rights that these associations are concerned with in terms of their day-to-day work. So through my interactions with women's associations and all of the interviews that I have mentioned to you, this has been a key part of my research."

¶ 62    On cross-examination, Wing testified that she was not a lawyer and was not authorized by any law to give legal opinions with respect to the interpretation of a legal statute. On redirect, Wing testified that part of her work in the instant case involved collaboration with Dr. Daniel Tessougue, a former member of the Ministry of Justice in Mali and former Malian judge who was the chair of the department of civil and criminal law for the school of law and political science at the University of Bamako.

¶ 63    After Wing testified as to her qualifications, defendants' attorney argued that she was not qualified to render a legal opinion as to the validity of Sissoko's marriage because she was a layperson and not an attorney. The court noted that "she spent some time over there and studies some issues that may be related to this; but ultimately, the basis of her opinion is going to be her reading of the statute, her familiarity with the statute, and her reading of some marriage abstracts as a political science professor who studied in Mali and researched in Mali and speaks French. So how does that–How does that position her in front of this Court to give that sort of opinion?" Nevertheless, ultimately, the trial court overruled defendants' objection and permitted Wing to testify, noting that defense counsel's concerns "go[ ] to perhaps the weight of her testimony ultimately, not the fact that she lacks some threshold knowledge that brings her beyond the ken of the Court here."

¶ 64    During Wing's testimony, the trial court sustained a number of objections on the basis that the questions asked sought legal opinions. However, Wing was permitted to testify that the marriage documents did not contain any indication that the marriage was a proxy marriage, although such a marriage was permitted under Malian law. Wing also testified that "many Malians believe they are undergoing marriages when in fact those marriages have no legal significance or recognition by the state. It's a common problem in Mali."

¶ 65    Several hours into the deposition, the court asked Wing to step out and asked Ruder to "[t]ell me what you want to do with this witness." The court stated:

"I want to know. I need to hear it now because, quite frankly, what I've heard so far is she's reading, she's translating for me a statute from French to English that evidently is the Malian code that was in effect in 1998. And she tried to do that accurately, and I'm sure it's substantively quite accurate. And then she attempted to interpret the statutes and interpret the testimony of witnesses who have come before this Court, and

- 13 -

I didn't allow her to do that. She has no practical experience in family law in Mali. She evidently went over there and researched–no practical hands-on experience in Malian divorce law, in Malian marriage law. She studied the marriage laws and studied the act, I suppose, She goes over there, and she speaks about women's rights issues in a traditionally religious society. That's what I've heard. And she's being asked to give legal opinions in a case. She's basically recited a statute that I could read if it was interpreted for me and then regurgitating testimony that's already been presented to me.

Where are we going? I mean, I don't know where we're going with this. I thought I was going to be hearing things about, you know–I don't know. I've gone out in the villages, and I've spoken to people; and there's this tension between women who want to get married this way or men–the senior elders in the village who want ladies to get married this way. And they get married that way; and then suddenly, five years or ten years later, there's a divorce that comes up, and suddenly they invoke: Well, that was a religious ceremony, and it didn't comport with this. And I've studied that issue repeatedly. I didn't know where she was going with this. That would be the sort of experience maybe someone who's doing the studies might be able to shed some light on in this court. But I didn't hear that. I don't expect to hear that.

So I'm starting to get to the point where we've got legal conclusions here from a political science professor from Haverford College that you've brought in."

After some discussion, Ruder stated:

"The offer of proof will be that she will look at the registry of the marriage–the Marriage Registry of the Mayor's Office of Bamako, Pages 1 and 2 of the Marriage Certificate; and she will indicate whether or not there's any language on the document that indicates there is a proxy marriage or that someone is standing in for Mr. Keita. And she will do the same thing with the Declaration of Marriage. That's my offer of proof."

¶ 66 After Wing's testimony, Bangaly subsequently filed a motion to supplement Wing's opinion with an affidavit that would serve as an offer of proof. The trial court denied the motion, both because Ruder had an earlier opportunity to make an offer of proof and because the court's opinion would not have changed even with the expanded offer of proof:

"I ultimately did give you a chance to make an offer of proof, and it doesn't certainly go anywhere near this very legalistic Affidavit that was eventually submitted as an exhibit. It was much more limited than that. And, like I said, if that would have been the offer of proof, just so the record is clear, for your benefit, if you would have made this offer of proof, this Affidavit, my position would have been: She's giving legal opinions, conclusory opinions, without the basis to provide those sort of opinions to me and without the requisite qualifications, skill, expertise, or knowledge. And other than the conclusory claims that she has that sort of knowledge, it's not set forth in the Affidavit. The basis of this ultimate knowledge–She's not a lawyer. She's not a judge."

## E. Affidavits

### 1. Ndaiye Keita

Defendants submitted the affidavit of Ndaiye Keita, Keita's cousin, which stated that Ndaiye prepared a written consent for Keita to sign that would allow Keita's brother to stand in for him at the wedding ceremony in Mali. Keita signed and dated the consent, and it was notarized by a notary public in the Bronx. Ndaiye learned that Keita gave the consent to his brother Sambou Keita, who brought it to Mali and gave it to Keita's other brother, Mamadou Keita, who stood in for Keita at the ceremony.

### 2. Mamadou Keita

Defendants also submitted the affidavit of Mamadou Keita, Keita's younger brother, which stated that he "stood in as the authorized representative of Noumouke Keita at the wedding ceremony to Hawa Sissoko held on July 30, 1998, in Bamako." Mamadou's affidavit further stated that he "signed [his] name as Noumouke Keita's representative on the marriage certificates for the marriage of Hawa Sissoko and Noumouke Keita."

### 3. Sy Fatoumata Coulibaly

Defendants also submitted the affidavit[10] of Sy Fatoumata Coulibaly, which stated that in her capacity as "Chief of the Secondary Civil Affairs Center of Lafiabougu I in Commune IV of Bamako, and as Civil Affairs Officer of such Center," Coulibaly celebrated the marriage between Sissoko and Keita on July 30, 1998. The affidavit further stated that the marriage was properly recorded in the marriage registry, and that "the marriage of the KEITA spouses was celebrated in compliance with laws in effect in Mali at the time of the marriage and that such marriage is properly and legally celebrated." Finally, Coulibaly's affidavit stated that "in the context of [her] practice as a Civil Affairs Officer, [she] ha[s] never had to show on the marriage certificate the mention of the 'proxy' for marriages celebrated by proxy. Moreover, in practice, this mention does not appear on marriage certificate[s] for marriages celebrated by proxy."

### 4. Bouram Sidibe

Defendants also submitted an "interpellation order"[11] of Bouram Sidibe, court bailiff in the judicial jurisdiction of the court of appeal of Bamako, in which Sidibe certified: (1) "Yes, the marriage between Mr. Noumouke KEITA and Mrs. Hawa SISSOKO was indeed performed in our Secondary Center on 07/30/1998"; (2) "Yes, this marriage is in accordance with the laws of Mali"; and (3) "Yes, the certificates of this marriage are indeed consistent with the Registry we maintain for that purpose."

---

[10]Defendants submitted both the original French document and an English translation.

[11]Defendants submitted both the original French document and an English translation.

### 5. Moussa Keita

Defendants also submitted the report[12] of Moussa Keita,[13] a Malian attorney, in which Moussa opined that "the marriage celebrated between Mr. Noumouke Keita and Hawa Sissoko is, in my opinion, proper and in compliance with the requirements of the law in effect in Mali at the time such marriage was celebrated." Moussa noted that "[u]nder Malian law, the lack of consent of one of the spouses is cause for relative nullity seeking to protect the person whose consent is vitiated. In the case of the marriage in question, there is no evidence of lack of consent by one of the spouses." Moussa noted that Keita "tacitly confirmed his marriage with his wife by deciding to bring her to the United States into his family and by having a communal life with her," and further noted that even if there had been no consent, a claim of nullity for lack of consent would have needed to be brought by Keita within two months of the marriage, which had long since elapsed.

### 6. Mamadou Diakite

Defendants also submitted a report[14] from Mamadou Diakite, "Judge at the Court of First Instance for Commune III/District of Bamako," which likewise opined that "the marriage between Noumouke Keita and Hawa Sissoko is valid according to the laws of the Republic of Mali."

### 7. Daniel Tessougue

Bangaly submitted the affidavit of Daniel Tessougue, a judge and professor of law at the Bamako University extension of the Catholic University of West Africa. Tessougue formerly held the chair of the department of civil and criminal law for the School of Law and Political Science of the University of Bamako, and was in charge of instruction at the Mali National Institute of Judicial Training, "where future magistrates and other practitioners are trained in law." Tessougue also formerly taught a course on family property law at the School of Law and Political Science at the University of Bamako.

Tessougue stated that "the entry of the power of attorney must be expressly indicated on the marriage record in the event that Mr. Keita was not present. The mention of his written consent must also be noted." Tessougue further stated that "[i]f this entry does not appear anywhere on the document, the legal capacity of the document is very doubtful." Tessougue concluded that "I am justified in saying that I have strong doubts as to the legal capacity of this record which, in my opinion, is a forgery disguised under the formalities used by a legal authority who either voluntarily or involuntarily lent support to this act."

### F. Abed Awad

On October 4, 2012, Abed Awad testified at an evidence deposition that he lived in New Jersey and was an attorney who also taught at several law schools; he had a native fluency in

---

[12]Defendants submitted both the original French document and an English translation.

[13]Moussa was not related to Keita.

[14]Defendants submitted both the original French document and an English translation.

Arabic but did not speak French. As with Wing, since Awad's qualifications are at issue on appeal, we relate them in some detail. Awad testified that he attended graduate school at Columbia University for a year, where he took classes in reading and studying Islamic legal texts and in studying Islamic revivalist movement, including movement in West Africa; Awad testified that Mali was a majority Muslim country and was a "very conservative and traditional society." After Columbia, Awad studied at the University of London School of Oriental and African Studies for two years, obtaining a master's degree and a certificate in comparative law, for which "we basically studied all legal systems that were part of the British empire. We studied the African legal system; we studied the Islamic legal system; we studied the civil law system; and we studied the common law system understanding how these systems intersect, how they are similar, dissimilar and what have you"; Awad testified that the African systems he studied included Mali, and that in order to know and understand the current Mali code, it was important to understand "how the tribal custom, traditional Islamic law and French law intersect."

¶ 85     After studying in London, Awad attended Pace Law School in New York, where he was a member of the international law review and studied international constitutions, especially countries from the Middle East. After finishing law school, Awad clerked for a family court judge in New Jersey before establishing a law practice in New Jersey and New York, which "evolved at that period of time to represent a large immigrant foreign population, whether from Africa, from the Middle East or from Southeast Asia." Awad testified that his primary area of focus now was international family law matters.

¶ 86     Awad testified that he taught Islamic jurisprudence matrimonial litigation at Rutgers Law School, as well as Islamic law of banking and finance at Seton Hall Law School. He was also a fellow of the International Academy of Matrimonial Lawyers, which was "an invite-only academy that requires practicing attorneys to be invited who've practiced for 10 years and where a substantial part of their practice involves international family-related matters." While he had testified a number of times concerning North African countries, Awad admitted that he had never testified specifically on Mali. However, Awad testified that "West Africa and the Middle East, these are civil law-based countries. They all almost have identical codes, whether they're the civil codes that are identical or their family codes. Mali, of course, has a code that's similar to many other West African countries." Awad further testified that "[m]y training and understanding of how to read these codes in these various countries, neighboring countries of Mali, knowing the historical context of these countries, knowing their tribal customs and being a matrimonial lawyer who is seasoned, been practicing 13, 14 years, involved in many international issues involving validity of marriages in many, many countries, that all combined gives me a unique insight and an ability to understand validity of marriage issues that very few lawyers can do what I have."

¶ 87     Awad testified that after reviewing the laws of Mali, it was his opinion that the marriage of Sissoko and Keita was valid under Mali law. First, he noted that the document authorizing Keita's brother to stand in for him at the wedding ceremony was notarized, and there was no indication under the Mali marriage code that the notarization needed to occur at a Mali embassy or consulate in the United States. Additionally, Keita's brother was physically present at the ceremony with the document, as evidenced by the affidavit of the civil service officer who performed the ceremony. Awad explained that the civil service officer is required by law

to request and verify that all necessary documents are present before proceeding with the ceremony, and is subject to criminal penalties for failure to do so.

¶ 88 Awad rejected the conclusions of Bangaly's experts that the consent was obtained by fraud or the marriage documents themselves were fraudulent, noting that "when you look at the totality of the evidence, we have parents admitting they were there and she was married. We have a groom that says, I appointed my brother and I got married and she moved in and we consummated the marriage. We have the brother who stood in [his] place saying, I was there and that is my signature, and I have his affidavit. We also have the testimony of the other experts that defense has retained saying the same thing. So there is a combination of all of the evidence, both documentary and testimony under oath, that shows beyond question to me that this document was not a forgery."

¶ 89 Awad testified that even assuming *arguendo* that notarization at the Malian embassy was required in order to permit Keita's brother to stand in for him, such a technical defect would merely render the marriage contract voidable, not void, and that such a defect could be cured. Thus, Awad testified that "even if we argue that the interpretation of Article 10 [of the Mali Marriage Code] says they must have an Embassy sign that authorization, but we have a circumstance where parents were there, the bride was there, the brother said, I was there and I saw it, we have a wife that then leaves her mother country, joins her husband in New York, lives with him for many years, consummates the marital relationship, everybody knows they're husband and wife, I mean, clearly all of those circumstances would cure this technical defect that it was notarized by a New York notary, not by a Consulate." Furthermore, Awad testified that Keita would be the only one to have legal standing to challenge consent, since it was his consent that was at issue, and here, "we have the person that allegedly did not consent is testifying under oath, I consented and I consummated the marriage."

¶ 90 Awad also testified that there was nothing in the statute requiring Keita's brother to indicate that he was signing the marriage documents on behalf of Keita, and pointed out that everyone involved was aware that Sissoko was marrying Keita, not Keita's brother. Further, Awad testified that even assuming there was such a requirement *arguendo*, the defect would again only render the marriage contract voidable, not void.

¶ 91 Finally, Awad testified that the fact that there was only 14 days' notice of the marriage instead of the 15 days required under Mali law did not render the marriage void, since nobody had raised an issue either before or after the marriage indicating that Sissoko was already married, which was the only thing that would render it void.

¶ 92 On cross-examination, Awad testified that Islam was not the official religion of Mali, unlike some other African countries he had studied; instead, Mali was a secular country. Awad further testified that he had never been to Mali, had never represented a Malian national in a family law case, and had never previously been qualified by a court as an expert in Malian family law.

¶ 93                                IX. Keita's Intervention and Close of Posttrial Discovery

¶ 94 While posttrial discovery was ongoing, on August 8, 2012, Keita filed a motion to intervene in the action, claiming that he was Sissoko's rightful heir. On August 14, 2012, at a status hearing, the parties discussed Keita's motion to intervene; Keita's New York and local

counsel were present in court.[15] Defendants had no objection to intervention, but Bangaly asked for time to file a response. On August 22, 2012, Bangaly filed a response to the motion to intervene, arguing that the motion was untimely and that Keita had not established that he actually had an interest in the case.

¶ 95 On September 6, 2012, the parties came before the court on several motions, including Keita's motion to intervene; Keita's New York and local counsel were present. Keita's counsel argued that Keita's motion was timely, and, with regard to the question of Keita's "game plan," stated that "I think right now my attitude is to just sit and watch to see how it works out, and then–with the understanding that our interests are going to be somehow represented in the dispute between the plaintiffs and the defendant, and I spelled out that what I'm looking for is for the verdict as far as liability to stand but that the damages be thrown out and that there be a new trial on damages with Mr. Keita being the appointed administrator of the estate and, by the way, the sole member of that estate." The court entered and continued the motion to intervene.

¶ 96 On October 9, 2012, the trial court ordered posttrial discovery closed, and ordered the parties to file posttrial motions for relief.

¶ 97 On November 6, 2012, Bangaly filed a motion to bar Abed Awad's opinion testimony, arguing that Awad had no education, experience, or knowledge relating to Mali law and that Mali law differed significantly from the laws of the North African countries with which Abed claimed expertise and was "a very narrow, specialized subject area." Additionally, the motion claimed that Awad was unable to read, speak, or understand French, but engaged in extensive statutory interpretation of a statute written entirely in French.

¶ 98 On the same day, defendants filed a motion regarding the issue of heirship under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2010)), seeking an evidentiary hearing and a finding that Sissoko and Keita were legally married at the time of her death and that Keita was the sole heir and beneficiary of Sissoko's estate. Based on those findings, defendants would then move for appropriate relief from the verdict and judgment entered at trial.

¶ 99 On December 3, 2012, Bangaly filed a response to defendants' motion regarding heirship, arguing that defendants' claims were wholly without merit and an evidentiary hearing was not necessary. In the alternative, Bangaly asked the court to find that Sissoko and Keita were not legally married at the time of her death and that Keita was not the heir of Sissoko's estate.

¶ 100 X. Hearing on the Issue of Heirship

¶ 101 On December 13, 2012, the parties came before the court on Bangaly's motion to bar Awad's testimony and defendants' motion on the issue of heirship. Concerning Awad's qualifications as an expert, the trial court noted:

> "I found Mr. Awad to be a very intelligent, very capable, and very knowledgeable individual. I was impressed by the manner and demeanor in which he testified. He was posed questions on both Direct and Cross Examination and Redirect and Recross Examination and was an impressive witness in terms of his ability to answer questions that were posed to him by very talented and capable attorneys on issues that pertain to divorce law, matrimonial law, and the application of Malian law to the circumstances

---

[15]At this hearing, Keita's New York counsel was admitted *pro hac vice*.

of this case, which involve a claim that a man in New York, Mr. Keita, was marrying Hawa Sissoko, who was in Mali, by proxy marriage at a time quite a while ago.

I found him to be a rather convincing witness in terms of his demeanor and the ability with which he was familiar with the issues in this case that came at him from a number of different angles, so to speak. His proficiency in the area is clearly evident. I do believe he has a certain level of experience and knowledge that this Court perhaps–and any other Court, for that matter, might find helpful on the issues that are before it. So I believe that he crosses the threshold of displaying and having the requisite knowledge, experience, education, and training that would assist this Court on the matters before it that pertain to matrimonial law, Malian law; and so accordingly, I'll accept him as an expert in this area.

And I am mindful of the fact that the Plaintiffs note that much of his testimony is just, you know, regurgitating, if you will. I don't mean to diminish it, but re-presenting, if you will, what is explicitly stated in the Malian code that both sides agreed is in full force and effect at the time in question. So because these parties–the parties here are not in dispute as to the applicability, the interpretation of that code and those code provisions which are before this Court, that is another reason why I am making the finding that I am.

There's no one on the other side, if you will, who has testified otherwise with respect to much of what Mr. Awad has put forward. I do know there are some disputes, though, as to the manner in which this marriage or the purported marriage was performed. And so I'll accept him as an expert in this area, and his testimony will stand. And you can argue its weight or its persuasiveness as you wish."

¶ 102     At the hearing, the court discussed with the parties what evidence was "fair game," because the court "want[ed] to make sure that there's no dispute as to what's properly before th[e] Court." The court determined that the depositions were properly before the court, because the witnesses testified live and were subject to cross-examination, including the pretrial depositions of Sissoko's parents. The parties also stipulated that, as to several affidavits, the named individuals would testify consistently with their affidavits; specifically, the stipulation referred to the affidavit of Tessougue for Bangaly, and Mamadou Keita, Ndaiye Keita, Moussa Keita, Judge Mamadou Diakite, and Sy Coulibaly for defendants. With regard to the certification of Bouram Sidibe, Bangaly stipulated to questions one and three, but did not stipulate to question two, which asked, "Is the marriage in accordance with the laws of Mali?"

¶ 103     The court stated that it was first considering whether defendants had rebutted the presumption of heirship arising from the entry of the probate court's order of heirship. The court noted that there was no dispute that a ceremony had occurred and that the purpose of the ceremony was a marriage between Keita and Sissoko. The court further pointed to Keita's testimony, photographs of Sissoko and Keita, and testimony that this was an arranged marriage in which the families knew each other. The court concluded that "there is competent evidence that's been put forward to this Court from the testimony of Mr. Keita himself that refuted and rebuts, I should say, the presumption that at the time of her death, she was not married." The court further pointed out:

"[T]he divorce decree itself perhaps is the best evidence of marriage in the case. The fact that the parties at the brink of trial would put that forward, interject that into these proceedings, indicates that in this family or these extended families, and in this

- 20 -

community–I speak loosely in terms of the community–at least the community in Mali that recognized the marriage of Hawa in accordance with Malian law, and many of whom witnessed her as she took her vows, so to speak, and Mr. Keita, both extended families in the Malian community, it's clear that this marriage was recognized. There was cohabitation. There was consummation. And it rebuts the presumption that in fact the proper heirs are the mother, father, and the siblings."

¶ 104    After considering whether the presumption of heirship was rebutted, the court then considered whether the marriage between Keita and Sissoko was valid. As the court's decision is at the heart of the instant appeal, we quote its reasoning in full:

"Okay. The Court is well aware of the facts and the testimony and the evidence that underlies what's before the Court here. I think first and foremost, because the divorce decree has been mentioned here today and has been referred to as a moot issue by the parties, I think I should upfront and foremost just make it clear for the record what value it might have for this Court, for me, in these proceedings. I'm aware of it. I don't think I can ignore it. I think it would be ridiculous to ignore it, given the fact that officers of the court and parties before this Court presented it, I suppose, to Judge Flanagan, Judge Solganick, and it was actually referenced here I think on the day of trial assignment, from what I recall.

And I understand the history of this case and I understand how it evolved or devolved to that point and that it comes from the real parties in interest who stand to take if this judgment stands, namely Hawa's parents and her siblings. And so I'm not going to ignore it. I know it's there.

I understand the parties have referred to it as being moot, but how it devolved to that point is very indicative of the fact that there was a marriage here. The real parties in interest who stand to take here evidently are the ones who generated this document, and it's been abandoned by them and has not been put forward before this Court in any way to instantly defeat any claim against this judgment or any claim to the cause of action by someone else, I should say, namely Mr. Keita. It's not before me. It's not being referenced. And I think it's the, if you will, the missing witness that obviously smells the most here.

Counsel for Defendant has put forward that they don't have a burden to establish or prove fraud here. That's clear. They don't. Nor does this Court have to necessarily make a finding of fraud here. But it appears to me that from the start of this case, ab initio, if you will, there is a very serious question about whether or not these are the real parties in interest, whether or not they stood to take under the Wrongful Death Act, namely because of the fact that in 1998, there was a marriage between Hawa Sissoko and Mr. Keita.

There's no dispute between the parties that some ceremony took place, that the intended spouses were those two individuals. It was by proxy marriage, which was permitted by Malian law. I'm now more familiar with Malian law than I ever hoped or expected to be, and I'm sure you would say the same thing. But the Code that is pretty clear and was very capably put forward and discussed by Mr. Awad before this Court makes it very certain that in Mali, in place at the time, were Code provisions that in essence give only now the surviving spouse, Mr. Keita, the right to in essence challenge the validity of an original marriage.

I know there was some suggestion that perhaps others have standing to do so, and I'm not prepared to find that the family doesn't have standing to assail who the rightful real interested party is here in Illinois in a Wrongful Death Act. Clearly I think they would under Illinois law, at least; but these two individuals consented to marriage evidently by their presence at the ceremony, one in New York, one in Mali. Evidently there was a representative stand-in. I understand and appreciate the Plaintiff's comments and remarks and arguments about the deficiencies that appear in the marriage certificate, in the signatures that evidently or signature that doesn't appear where perhaps it should appear, in the technical deficiencies surrounding things such as publication.

I understand and appreciate those arguments. But the simple fact of the matter remains that in Mali, as in virtually everywhere else in the world, those technical deficiencies are not remedied many years later by courts finding that these marriages were invalid from the get-go. That's not the remedy. It's certainly not the remedy.

In fact, in Mali anyone who has the ability to challenge the marriage–in this case Hawa's parents did not, nor did their siblings–had the right to do so within two months.

Permission was not required or, I should say, consent was not required to be given to Hawa and/or to Mr. Keita in order to agree to this marriage. It was performed by the proper civil officer in Bamako. I have seen and examined the affidavit and obviously the marriage certificate itself. That stands, and no one has put forward anything to suggest or undermine that in spite of whatever deficiencies there may be present.

The remedy is not to find that this marriage was void from the beginning. The deficiencies in that are really just ministerial after certainly a few months or a couple months, for that matter. And I'm not even sure they would be or could be, and I can't think of the scenario under which they would be objected to by any spouse that was contesting a marriage within two months.

But nevertheless, I think that the clear evidence in this case, and the overwhelming evidence in this case, is that Mr. Keita did in fact marry Hawa Sissoko back in 1998; and they remained married up until the time of her death. There's no divorce decree that's been put before me to suggest otherwise nor does any of the evidence that's been commented on or argued or presented here rise to the level of finding that this marriage is void.

Mr. Awad testified to the voidability of marriages and to when and under what circumstances that might happen. Obviously when you have minor children that get married, the timeframe in which they can void marriages in various countries is extended because they're in their minority when they get married, and they retain the right, although they can continue to be married and demonstrate that they want to remain married once they reach their majority, and no one can assail that eventually. But that's not the circumstance we have here.

These parties intended to get married evidently by their acts and what they did, showing up at these ceremonies. It was by parents, a mother and father, eventually acknowledged by them, I should say, after they had what they thought was the assurance of a divorce decree to continue on with their rights here.

Why Mr. Keita remained a latent party, if you will, lying in the weeds for all this time, I don't know. I don't know what sort of discussions were had between him and perhaps Mr. Bangaly or other family representatives. I don't know what was exchanged or said. I don't know if all of that can be excused just on his, you know, ignorance of the law here in Illinois or in Indiana, his belief and assurances from the family that he would be included in the case or perhaps in some award. I don't know. I really don't know.

And I appreciate Mr. Thera's commentary on the challenges in Mali and the corruption that might be present in that country. He basically says everything is corrupt and then goes on to say that he himself stands to take 35 percent of any award from the family. That's what he negotiated, a pretty reasonable fee. I think both sides would acknowledge it's above what is typically the percentage for plaintiff's lawyers.

So I think I've commented on most of the evidence or the majority of it or at least that which has convinced this Court that the mother and the father and the siblings are not, under the Wrongful Death Act, the real parties in interest or the heirs that could bring such a matter."

¶ 105    On December 17, 2012, following the hearing, the trial court entered an order finding: (1) that the evidence presented by defendants successfully rebutted the *prima facie* evidence of validity of heirship created by the order of heirship entered by the probate court on November 21, 2007, thereby shifting the burden to Bangaly to prove that Sissoko and Keita were not legally married at the time of her death; (2) that Sissoko and Keita were legally married in 1998 and remained married through the time of Sissoko's death in 2007; (3) that, as the surviving spouse, Keita was the sole heir of Sissoko under the Wrongful Death Act; and (4) Sissoko's parents and siblings, previously named heirs in the order of heirship, were not the proper heirs at law or next of kin under the Wrongful Death Act. The court further ordered that Keita's motion to intervene was granted and set the deadline for posttrial motions for February 13, 2013.

¶ 106    On December 18, 2012, the trial court entered an order denying Bangaly's motion to bar the testimony of Awad. On December 20, 2012, Bangaly filed a notice of appeal (case number 1-12-3760), appealing the December 17, 2012, order pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Feb. 26, 2010). On January 9, 2013, defendants filed a motion in the appellate court to dismiss the appeal, arguing that Bangaly sought an appeal from a nonfinal order in a wrongful death case and that there was no basis for appellate jurisdiction. On January 17, 2013, the appellate court entered an order stating that the motion would be taken with the case.

¶ 107                              XI. Posttrial Motions to Vacate

¶ 108    On January 7, 2013, Keita filed a motion to vacate the damages verdict and to remove Bangaly as administrator of Sissoko's estate.

¶ 109    On January 8, 2013, defendants filed a motion to vacate the judgment and for dismissal of the case with prejudice. Defendants argued that the judgment must be vacated, since Sissoko's parents and siblings were not Sissoko's next of kin. Further, defendants argued that since Sissoko's parents and siblings were named in the complaint, the complaint should be dismissed with prejudice because Sissoko's parents and siblings had no viable claim under the Wrongful Death Act.

- 23 -

¶ 110     On January 10, 2013, at a hearing on a motion to stay the proceedings pending appeal, Bangaly's counsel stated that it was Bangaly's position that the ruling on heirship was against the manifest weight of the evidence. In response, the court stated:

> "So noted. I stand on the remarks I made earlier. I've assessed everything the plaintiffs have put forward. In particular, I wasn't convinced at all by professor/lawyer/judge Tassougue's [*sic*] affidavit that was very conclusory and contained much watered-down language in the face of the history of the relationship between these two individuals, two families in a traditional Malian society who recognized a marriage, a ceremony that was performed, a wedding dress, cohabitation, movement from Mali to the United States.
>
> In essence, the response that this was technically violative of Malian procedures or Malian statutes didn't carry any weight and, you know, that's, in essence, what I ruled. If you aren't aware of it, that's what I've ruled."

¶ 111     On January 29, 2013, the parties came before the trial court on a hearing on defendants' and Keita's respective motions to vacate. Again, because the trial court's reasoning and decision at this hearing are of utmost importance to the instant appeals, we quote the trial court extensively. When hearing argument from Keita's local counsel, the trial court asked several questions about Keita's absence from the proceedings, noting that Keita had never been physically present in court and that even his deposition was conducted through a videoconference. The court stated that "I was wondering if he would be here today, if the Lutwins [Keita's New York counsel] would be here today, in light of, you know, the big history in this case, in light of its importance to him. And his absence is striking, and it's been striking. And he's been absent virtually since obviously May of 2007, absent. Latent, I think I referred to him as at one point, kind of in the weeds. His latency has been strange and odd." Later, the court continued:

> "I don't know when Mr. Keita was first speaking with the Lutwins. And you can correct me if I'm wrong, if there's a record here that I'm overlooking; but I'm taking it that when you [Keita's local counsel] first show up here in August, that's when he's attempting to intervene for the first time in the judicial proceeding involving his wife's death.
>
> For the first time, he's standing up to vindicate her rights. That's in essence what's happening here. In a wrongful death case, you vindicate the decedent's rights, and you benefit from that by proving your loss to society. He didn't do that all along.
>
> What I find most remarkable is, and I guess I'll pepper you with this question: Isn't it strange and odd that he only does that when the Plaintiff's position changes in July, and they abandon the divorce decree, and suddenly they shift, and they want to strike at the very foundation of a 14-year-old marriage at that point? Isn't the game up, and he's got to come forward? And doesn't that say so much about Keita that would allow this Court to expansively bring the fraud to him? Why not? That's perhaps the most convincing piece in the puzzle, so to speak, against Keita."

In response, Keita's counsel argued that Keita became involved in the case when he first spoke with Ruder and signed a contract, which was almost immediately voided, noting that "it's very simple to see why," with "one over here, and there's eleven over there." The court then stated:

"That brings up perhaps the next, and it's hard to quantify it. That's, you know, more significant against him or less; but he's latent in November, in December, and January, and he's knowledgeable about his cause of action within days of her death. And he remains latent intentionally for some reason, knowingly. And I'm supposed to dismiss it all off as this ignorant guy from Mali, west Mali, this poor, you know, formally uneducated man?

I've got 'sly as a fox' written down in my notes. Why should I not find him, a formally rather uneducated sly as a fox, okay? The term that he [defendants' counsel] used, you know, kind of coincidentally, but why shouldn't I?

Doesn't it all make sense in this case to find that this was an arranged marriage and an arranged fraud, and it was done so to present to a jury much more compelling loss of society damages than an estranged husband who's in New York a thousand miles away from Hawa for two years? I mean, what would you rather stand in front of a jury with? Which evidence? Would you rather have ten family members in Mali, in a poor village, who haven't seen their daughter for seven years, and she's killed by this truck that doesn't even hit the brakes and incinerated? And she's just a poor hair braider, sending home a few hundred dollars a month to support this family, basically. She's doubling the father's salary. What's more compelling?"

The court also made another comment concerning the effect of Keita's absence from the trial:

"Arguably, the case might have settled, you know? Someone who's estranged from his wife for two years, and the evidence is he's estranged. His parents said that they were estranged. They were, you know, not getting along, it didn't appear. At least there was evidence where they could have stood before a jury, which brings me to another point on the issue of damages.

Didn't Mr. Keita and Mr. Bangaly, Mr. Keita's latency, Mr. Bangaly's fraud, orchestration of fraud, the center of the fraud, didn't it deny the Defendants the ability, in a close case–and it is a close case on the issue of suicide–to put another piece before the jury that perhaps they could have compromised on probabilities and found 50 percent at fault or more for her, even if they didn't find her 100 percent at fault for having committed suicide. But namely the estrangement, there's a 28-year-old girl, stuck in the United States of America, away from her family, here because she–you know, she got–she got the golden egg laid by the goose. She came to the U.S. She's able to support herself. Braid hair. Make the sort of money that allows her to buy property for her parents and her ten siblings back in Mali, to send money home two to three times a month, when there's emergencies for brother, she's sending money home. You know, she's not going back, and she's not really going forward, you know."

¶ 112    When Bangaly's counsel responded to the arguments of defendants' counsel by referring to Sissoko's family as a "West African family," the trial court interjected:

"It doesn't matter where they come from, Mr. Ruder, this notion that this is just a poor family that's been beset upon by a major trucking company. You can't talk about economic disparities before a jury, and I'll tell you right now, you're not going to get any traction here with that issue, certainly not with this history.

I don't care how poor or how terrible it is in Mali. Arguably, that's evidence against them. They come from a corrupt country. That's in the record. We're well aware, and

the Court can take judicial notice of what's going on in North Africa there, and that's all the byproduct of corruption and a lack of property rights in that country, a lack of due process, a lack of respect for courts and judicial systems, which apparently has been brought across the Atlantic here by these two families.

They don't seem to have much respect for the integrity of this Court, and I think perhaps it's a byproduct of their culture and their society and the poverty that's there. Ultimately that's what it can be traced to. Perhaps that should be peppered into this record. I don't think it's too far reaching. It's a corrupt country. Thera said it. And I think it's been acknowledged by both. And we have an abandonment of a divorce decree in this case, which evidently arose there somewhere, which is also evidence of it."

¶ 113    After hearing the parties' arguments concerning Keita's motion to vacate only the damages portion of the judgment, the court concluded:

"With respect to the rulings the Court's going to make today, I adopt every remark I've made today in this hearing, and I would convert any question I've peppered into a statement, to the extent they can be, about the Court's concerns and its questions about this evidence, which were peppered at the attorneys and designed to get them to comment on the evidence and comment on what I find to be reasonable, imminently reasonable, inferences that can be drawn from the totality of evidence in this case about what transpired.

I'm going to set aside not only the damage portion of the judgment, but also the liability portion of the judgment for initial reasons that relate to, I believe that the Defendants here were denied the ability to put forward all favorable evidence on the issue of liability, particularly as it revolves around what sort of relationships Hawa had in her life. Set aside the fact that the Court found the family of Hawa, her parents and her siblings, were not proper parties. The Defendants were denied the ability, by virtue of Mr. Bangaly, who I find to be a completely incredible–perhaps the most incredible witness in this case. By his design and his persistence, they denied–he denied on behalf of Hawa's parents and siblings the Defendants ability to fully defend this case with what could have been in the jury's estimation an important piece of evidence, namely that she in fact was married, and arguably the marriage hadn't gone well, which forced her to move to Chicago for at least two years outside, away from her husband, living in her uncle's house, braiding hair here for some reason, that she evidently couldn't braid back in New York. But nevertheless, they denied the Defendants the ability to put that evidence before the jury and asked them to find her act out there was an intentional act of suicide or, alternatively, to engage in what jurors do when they decide these cases and blend the liability evidence with the eventual damage evidence in the way only they can, especially in a case involving contributory negligence as a theory put forward by the defense.

So accordingly, I have no way, without prejudicing the Defendants in this case, to set aside just the damage portion of this judgment without setting aside the liability aspects of it. I would note that this Court or any Court, if it was presiding over this case again, would in essence have to try the case once again; and I think that vacating both damages and liability here certainly doesn't waste any additional judicial resources. The Court's going to have to hear it anyhow.

- 26 -

I would note too that it would just be an awkward way to try the case, to somehow have to either keep the 15 percent contributory negligence determination as some sort of offset against an admitted liability or Court-directed liability finding for the new jury to consider damages. That would be a bit strange and odd. And accordingly, I can't bifurcate that. So it's vacated in its entirety.

I'm going to remove Sylla Bangaly as the Administrator of the Estate of Hawa Sissoko for all the reasons I've stated throughout these proceedings since the judgment was entered. I don't find him to be credible. I don't find him to be believable. I certainly don't find him to be someone who has the interest of her estate in mind, someone who would seek out the true beneficiary of her estate, true, proper parties in interest. I think the record reflects that. He's not deserving of the title of administrator; and based on all the reasons I've indicated throughout this finding today, the arguments today, my statements and questions today, he is removed.

As for appointing Mr. Keita, for the same reasons that I've announced here today, I'm not going to appoint him as the Administrator of the Estate. I don't know what other competent person I would need to appoint or why we would need to appoint anyone on behalf of the Estate at this time."

¶ 114    With regard to defendants' motion to vacate the judgment in its entirety and to dismiss the complaint with prejudice, the court concluded:

"Okay. I adopt once again the remarks I've made today; and to the extent that the questions I've peppered of counsel can be converted to statements, I do so in my ruling here today. The request here to dismiss with prejudice, I think first and foremost, with respect to Hawa's parents and her siblings, who are the previous real parties in interest, through Mr. Bangaly, who's now been removed, I will grant that request for dismissal with prejudice. I believe that this family clearly engaged in an orchestrated fraud upon the Court from the inception of this case, and evidently when it was in Indiana as well as a separate matter before being dismissed and refiled here.

They perpetrated a fraud all along for reasons that I suggest relate to more compelling loss of society damages perhaps or perhaps relate to the difficulties that arise from time to time in families, namely Hawa being married to Mr. Keita in an arranged marriage. She didn't know this man before they were married. She evidently after two years since marrying him finally moved to New York to be with him. And there's ample evidence in the record to suggest that the marriage perhaps didn't go well for a number of reasons. But nevertheless, there's evidence in the record that perhaps that's one of the reasons why she moved to Chicago.

But setting all that aside, the tortured history of this case, which particularly arose in November or October of 2012 when the question was posed by defense counsel, whether they were aware of it at that point or not or earlier in the year, is not clear; and I don't find that to be of great significance in this case because, as I said, the ultimate conclusion of this Court is that there was fraud ab initio, from the beginning, which renders everything this Court did a complete waste of time and is extremely aggravating and such a waste of the taxpayers who ultimately cannot be re-compensated for that lost time, those lost resources.

So it arose in October or November, questions about whether there was a marriage or not. And I think the record's very clear that there was a sudden scramble to find Mr.

Keita. He was found evidently by Mr. Thera, who knew Mr. Bangaly. There's evidence in the record that Bangaly said he never knew Keita. Keita says, 'Yes, I knew Bangaly. Bangaly's the one that called me to say that Hawa was dead and had died.' You know, it's–It's a bit strange that Bangaly says he never knows Keita. Keita says he knows Bangaly. It's in keeping with their eventual postures in this case before this Court, Keita now and Bangaly then, I suppose. Bangaly has to deny he knows him because he's trying to cover up the marriage, as he successfully did for a long period of time, for reasons that may again relate to strains between a family, that they didn't think perhaps that Keita should benefit from her death because, you know, they were estranged, and that they were the real family, and they were the ones who in essence, not statutorily, had the loss of society. He didn't. He was away from her.

So there seems to be a bit of a struggle going on. That's my interpretation of the totality of circumstances or perhaps one reason why this arose, this strain between the families. But nevertheless, it does arise; and there's a scramble with Mr. Ruder's office, with Mr. Ruder, with Mr. Thera, with Mr. Keita.

And most strange of all, Keita remains latent. In spite of the fact he's not formally educated, he knew exactly what was going on in Mr. Ruder's office. He knew exactly that the contract was being terminated. He knew exactly that he was being told to find another lawyer. And again, once again, he doesn't. He doesn't in Indiana. He doesn't all along in Illinois. And he doesn't after he's terminated by the firm of Goldberg Weisman Cairo.

It's been suggested he doesn't read English, and he doesn't read French, and that the letter of termination directing him to find his own counsel if he believed he had some rights–if he in fact got those letters, and I have no reason to believe he didn't–he could have walked out and asked the mailman to interpret it in English. It came from Goldberg Weisman Cairo on their letterhead. Or he could have asked someone in the Bronx who speaks French–there's plenty of Malians there, I presume–to interpret it in French for him. But this latency is never explained to the Court in the most critical period.

And when the prejudice to the Defendants becomes most critical, their ability to establish the marriage, which is a difficult thing to do, given the insular nature of these families and the insular nature of these two families within the Malian culture, which remains relatively intact when it comes here to the United States, based on what I've seen. That's a difficult thing to do. And they felt that they had some license perhaps, both families, to not only arrange a marriage, but arrange a fraud upon the Court. And that's what I find happened, and that's what explains the latency of Mr. Keita all along. It explains it in those critical months. It explains it after the judgment was entered.

He has now garnered a portion of the $4.25 million judgment in some private arrangement, which might be quantifiable with a 35 percent that Thera said he was getting. Thera alludes to the fact, as does Mr. Sissoko when Thera calls him and asks of the truth of whether or not there was a divorce. And Mr. Sissoko, a party in the case, in a statement against party interest says to Thera, 'Ask Keita. He knows stuff,' words to that effect in the deposition transcript testimony of Mr. Sissoko, which I think is pretty enlightening and pretty supportive of the Court's determination here of a pattern of fraud by these families, but most importantly with respect to Keita.

He never comes forward to this Court before or after the verdict until the point that it's clear that the ability of the Sissokos and Mr. Bangaly to thread the needle of divorce, to thread the needle of divorce, was abandoned by them because it just collapsed under its own weight. And that's what the Court believes occurred here in spite of the fact that neither side eventually became an active proponent of that decree, really by virtue of the fact that the Atlantic Ocean separates us from that and the cost of that, and the difficulty of finding these people and bringing them here and proving it by competent evidence. It is before this Court competently, though, in the form of affidavits.

I find most tellingly that Mr. Keita only arises within days of the abandonment of the divorce decree, when it's clear that Hawa's family, in order to maintain whatever private interest they had in this statutory right, was now assailing the 14-year-old marriage, and they were doing so outwardly. And it's at that point he realizes the game is up, and he has to maintain another safety net for these two families, then entering these proceedings five years and three months, I think it is, after the death of Hawa, certainly late, and certainly in the most egregious way in terms of prejudice to the Defendants, prejudice to the Court, prejudice, arguably, to Plaintiff's counsel and their firm and the expenditures of costs.

And so the only remedy here for this Court is to dismiss this case against not just the Sissokos and Mr. Bangaly, but against Mr. Keita as well. His latency is inexcusable. His inattentiveness is inexcusable and on its own face would justify this Court's determination. But the Court's gone beyond that, and the Court has made formal findings of fraud against both families here, in fact, Mr. Keita, the Sissokos, and Mr. Bangaly. They arranged a marriage, and they arranged a fraud.

And so the courthouse doors are closed, and the Court believes it has full authority to do this, to maintain the integrity of the courts, to maintain its court docket, and to balance and exercise its discretion as to whether or not another proceeding should take place.

Keita should not be able to come to court by virtue of his own laziness or latency, his own–he was on notice of the cause of action; and that at a minimum, his failure to come forward and his intentional remaining latent, or just his ignorance, his stupidity or his unawareness of what goes on in American courts or courts here in Cook County. That ignorance should not be borne by the Court or by the Defendants at a bare minimum."

¶ 115    After the hearing, the trial court issued a written order incorporating its findings and rulings stated in open court. With respect to Keita's motion, the court denied it in part and granted it in part, ordering: (1) the motion to vacate only the damages portion of the verdict and judgment was denied, as both the liability and damages portions of the verdict and judgment were vacated; (2) the request to remove Bangaly as administrator of Sissoko's estate was granted; (3) the request to appoint Keita as administrator of Sissoko's estate was denied; and (4) leave to amend the complaint to add Keita as a party or beneficiary in the action was denied with prejudice. With respect to defendants' motion, the trial court granted it, vacating the verdict and judgment entered on January 24, 2012, and dismissing the lawsuit with prejudice. Finally, the court found no just reason for delaying either enforcement or appeal, but retained jurisdiction to determine a pending motion for sanctions filed by defendants and costs.

- 29 -

¶ 116    On February 15, 2013, Bangaly filed a notice of appeal (case number 1-13-0624), appealing the January 29, 2013, order of the trial court, as well as the April 5, 2012, order granting defendants' motion for posttrial discovery on the issue of heirship. Additionally, in the case that his earlier appeal (case number 1-12-3760) was dismissed due to the order being nonappealable at the time it was entered, Bangaly also appealed the trial court's December 17, 2012, order determining heirship.[16]

¶ 117    On February 28, 2013, Keita filed a notice of appeal (case number 1-13-0729), appealing the trial court's January 29, 2013, order in which it dismissed the case with prejudice and denied Keita leave to amend the complaint.

¶ 118    The three appeals were consolidated and are now before this court.

¶ 119                                    ANALYSIS

¶ 120    In the case at bar, we consider the appeals of both Bangaly and Keita. Bangaly claims that the trial court: (1) erred in permitting posttrial discovery; (2) erred in its denial of Bangaly's motion to bar Awad's testimony and in its limitation on Wing's testimony; (3) erred in its ruling that defendants rebutted the presumption that Sissoko's parents and siblings were her heirs, as well as its conclusion that Sissoko and Keita were validly married, as the rulings are against the manifest weight of the evidence; and (4) erred in its finding that the Sissokos and Keita committed fraud, which was not supported by the evidence. Additionally, Keita claims: (1) the trial court erred in dismissing the case with prejudice as to Keita because he had no part in any fraud on the court and his intervention was timely; (2) the verdict as to liability should stand; and (3) he should have been permitted to amend the pleadings and to be appointed administrator of Sissoko's estate.

¶ 121    Since there is some overlap in these issues, we consider the claims on appeal in the following order: (1) whether the trial court erred in permitting posttrial discovery; (2) whether the trial court erred in determining that Keita was the sole heir of Sissoko's estate, including any issues as to the evidence considered by the court; (3) whether the trial court erred in vacating the judgment as to liability as well as damages; and (4) whether the trial court erred in dismissing the case with prejudice and refusing to allow amendment, in light of both its conclusions that Keita's intervention was untimely and that the Sissokos and Keita committed fraud on the court.

¶ 122    As an initial matter, we must also consider defendants' motion to dismiss the appeal in case number 1-12-3760, which we ordered taken with the case on January 17, 2013. The appeal in case number 1-12-3760, as noted, was an appeal from the trial court's December 17, 2012, order concerning heirship. Defendants' motion to dismiss the appeal argued that the order was not final or appealable, and was not appropriate for interlocutory review under Rule 304(b)(1). Regardless of whether the order was final or appealable at the time, it is now. Additionally, Bangaly included the December 17, 2012, order as one of the orders on appeal in case number 1-13-0624, meaning that the order is properly before us regardless of which appeal number it

_____

[16] As noted, Bangaly filed a notice of appeal (case number 1-12-3760), appealing the December 17, 2012, order concerning heirship pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. Feb. 26, 2010), and defendants filed a motion in the appellate court to dismiss the appeal. On January 17, 2013, the appellate court entered an order stating that the motion would be taken with the case.

falls under. Accordingly, we now deny defendants' motion to dismiss as moot and proceed to the merits of the appeals.

¶ 123                              I. Posttrial Discovery

¶ 124    The first issue we consider on appeal is whether the trial court properly permitted posttrial discovery in the case at bar. Bangaly argues that the trial court erred in permitting discovery on issues that were or could have been discovered prior to trial and also claims that the conversion of the discovery proceedings into a posttrial evidentiary hearing seriously prejudiced him.

¶ 125          A. Whether Trial Court Should Have Permitted Posttrial Discovery

¶ 126    The trial court has discretion over the conduct of discovery, and its decision will not be overturned absent an abuse of that discretion. *Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 352 (1998); see also *People v. Williams*, 209 Ill. 2d 227, 234 (2004) ("we review the circuit court's decisions regarding discovery for abuse of discretion"). " 'Abuse of discretion' is the most deferential standard of review–next to no review at all–and is therefore traditionally reserved for decisions made by a trial judge in overseeing his or her courtroom or in maintaining the progress of a trial." *In re D.T.*, 212 Ill. 2d 347, 356 (2004). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003).

¶ 127    In the case at bar, the trial court made the decision to permit discovery after trial and after judgment was entered on the verdict. The issue of posttrial discovery is a relatively rare one in Illinois, with only one Illinois case having squarely addressed the issue of whether such discovery is permitted under Illinois law. In *Shapo v. Tires 'N Tracks, Inc.*, 336 Ill. App. 3d 387 (2002), the appellate court was presented with the question of whether a trial court erred in denying a defendant's motion to conduct discovery after the case had been dismissed with prejudice. The *Shapo* court noted that, while a trial court had broad discretion in ruling on discovery matters, "Illinois has been exceedingly silent, however, on whether posttrial discovery is allowed." *Shapo*, 336 Ill. App. 3d at 395.

¶ 128    The *Shapo* court then examined the few cases in which postjudgment or postdismissal discovery had been discussed. First, the court determined that the supreme court had held *sub silentio* that discovery could be used in a postjudgment setting in *Gatto v. Walgreen Drug Co.*, 61 Ill. 2d 513 (1975). Additionally, the *Shapo* court noted that several courts had acknowledged the questions raised by posttrial discovery without squarely addressing the issue, pointing out that the appellate court in *Midwest Bank & Trust Co. v. Village of Lakewood*, 113 Ill. App. 3d 962 (1983), had stated that "although the rules are silent regarding the authority permitting postdismissal discovery, 'neither is there authority denying use of discovery after dismissal.' " *Shapo*, 336 Ill. App. 3d at 396 (quoting *Midwest Bank & Trust*, 113 Ill. App. 3d at 972-73). Finally, the *Shapo* court noted that Illinois had addressed the issue of postjudgment discovery in the context of a motion under section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2000)), and that the court in *People v. B.R. MacKay & Sons, Inc.*, 141 Ill. App. 3d 137 (1986), had found such discovery appropriate under the circumstances of that case, where the State had made a *prima facie* showing that the judgment was obtained by fraud. *Shapo*, 336 Ill. App. 3d at 396.

¶ 129    After considering Illinois law, the *Shapo* court then reviewed cases from other jurisdictions, which "reveal[ed] that the trial court is reluctant to exercise its discretion in

allowing postdismissal/postjudgment discovery unless there is some newly discovered evidence compelling it to do so." *Shapo*, 336 Ill. App. 3d at 397. Further, the court noted that "[i]n all of the foregoing cases, the courts did not allow discovery in cases where the evidence could have been discovered prior to judgment or dismissal. Although these cases are analyzed under the auspices of whether a new trial should have been granted, they are in agreement that posttrial discovery should only be granted in limited circumstances." *Shapo*, 336 Ill. App. 3d at 398. The *Shapo* court concluded: "Based upon the foregoing, we find that limited postdismissal/posttrial discovery is allowed, within the trial court's sound discretion." *Shapo*, 336 Ill. App. 3d at 398. However, under the facts of the case before it, the *Shapo* court found that the trial court had not abused its discretion in denying the defendant's postdismissal discovery request. *Shapo*, 336 Ill. App. 3d at 398.

¶ 130    In the case at bar, we cannot find that the trial court abused its discretion in permitting posttrial discovery to determine Sissoko's marital status. As the trial court noted, there were serious questions as to the proper heirs under the Wrongful Death Act that arose shortly before the trial, and the trial court was responsible for determining who was legally entitled to the damages award. In light of this uncertainty as to Sissoko's proper heirs, posttrial discovery was appropriate. In fact, we agree with the trial court when it noted that "I think it would be an abuse of my discretion *not* to allow for some postjudgment discovery here." (Emphasis added.)

¶ 131    We find unpersuasive Bangaly's argument that defendants should have known that there were questions concerning Sissoko's marital status long before trial because they had a copy of her marriage certificate (which was partially burned, in French, and mistakenly labeled a "birth certificate" by the claims investigator) and there was a check mark next to "divorced" on Sissoko's death certificate. Bangaly's argument overlooks the fact that Bangaly had consistently stated in sworn documents that Sissoko was never married. In his affidavit of heirship, executed on November 21, 2007, Bangaly stated that "HAWA SISSOKO was never married"; on the basis of that affidavit, the probate court entered an order of heirship declaring that Sissoko's parents and siblings were her only heirs. Additionally, even as of December 7, 2009, when he filed answers to written interrogatories propounded by defendants, Bangaly answered, "The Plaintiff's decedent was not married as of the date of her death" and "The Plaintiff's decedent had not been previously married before her death." We cannot find that defendants' reliance on the sworn responses of the administrator of Sissoko's estate means that they were unable to raise the issue of Sissoko's marriage at the time that they first became aware that it would be an issue, in October 2011. We also note that there is no indication that even Bangaly or his counsel noticed it was an issue until this time, either, given the fact that immediately after being informed of defendants' discovery of the marriage certificate, Bangaly's counsel contacted Keita and even filed a motion for leave to amend the complaint to add Keita until counsel became convinced that there had been a divorce and the motion was withdrawn. Thus, this was clearly not the type of situation where the information was obvious all along.

¶ 132    We also find unpersuasive Bangaly's attempts to argue that "the Circuit Court, through Judge Flanagan, Judge Solganick and Judge Lynch, correctly repeatedly refused defendants' requests to delay the trial so that they could conduct additional discovery," yet "Judge Lynch permitted defendants to conduct [posttrial] discovery on the same issues as to which the Court had denied pre-trial discovery." This argument mischaracterizes what the actual posture of this case has been. The first time the marriage issue came before the court was on October 31,

2011, approximately two weeks before the date scheduled for trial and approximately four days after defendants had discovered the marriage certificate. As a result of the discovery of the marriage certificate, the trial date was stricken. Then, on November 9, 2011, Bangaly produced the purported divorce decree; there was no indication at that time that the divorce decree was fraudulent. On November 14, 2011, defendants asked for additional discovery to investigate the status of Sissoko's marriage and divorce, which was denied; again, all that was known at the time was that there was a marriage certificate and a divorce decree and there was no indication that either of these documents was fraudulent or invalid in any way. On January 13, 2012, four days before the scheduled trial date, defendants asked for the trial date to be stricken for additional time to investigate the marriage issue because they had reason to believe the divorce decree was fraudulent, based on the investigation of an attorney they retained in Mali. On January 17, Judge Solganick denied the motion to strike the trial date, but noted that "[e]ven if the matter is tried and there's an issue as to who would take under the Wrongful Death Act[,] *** that would be something for the trial judge to determine with regard to any distributions that might be had from the estate of the decedent *** or if the case would be settled with regard to any distributions, that may be an issue with regard to who would take or if the matter is raised at that point, at least the trial judge would have a duty to see that there might be a hearing at that time to see who would actually receive any benefits under the Wrongful Death Act." On the same day, Judge Lynch denied defendants' renewed motion, relying on the previous decisions of Judge Solganick and Judge Flanagan.

¶ 133    This procedural history demonstrates that this exact issue was not before the court until January 17, 2012, the day of the trial. Each request by defendants was based on the information they had at the time: first, the marriage certificate; then, the divorce decree; then, the report that the divorce decree was fraudulent. Indeed, even at the point when the fraudulent divorce decree came to light, Judge Solganick specifically noted that "the trial judge would have a duty to see that there might be a hearing [when it came time for distributions] to see who would actually receive any benefits under the Wrongful Death Act," indicating that this issue was not one that could be easily glossed over. The fact that he determined that the trial, which included witnesses who had traveled from Mali, should nevertheless go forward as scheduled does not indicate that he somehow rejected the merits of defendants' arguments concerning the marriage. Accordingly, we cannot find that the trial court abused its discretion in permitting posttrial discovery on the issue of Sissoko's marital status.

¶ 134                    B. Propriety of Discovery Process and Evidentiary Hearing

¶ 135    We cannot say that the trial court abused its discretion in the way that it conducted the discovery process and converted it to an evidentiary hearing on the issue of heirship. In the case at bar, the trial court was extremely cognizant of the time and expense of posttrial discovery and attempted to alleviate those concerns by ordering all depositions to occur in open court with the trial court present to rule on objections and observe the witnesses. In this way, the trial court was performing what it termed the "dual role" of both expediting the discovery by "calling some balls and strikes" and substantively considering the evidence presented during that discovery so that witnesses would not need to come before the court twice. After discovery was completed, the parties submitted briefs on the issue of heirship, and, after a lengthy hearing at which the parties argued their positions, the trial court ruled, finding that Keita and Sissoko were validly married and that Keita was Sissoko's sole heir. We

cannot find that the trial court abused its discretion by choosing to conduct discovery and then proceed to an evidentiary hearing.

¶ 136 Bangaly claims he was prejudiced by the trial court's method of conducting discovery and then conducting an evidentiary hearing. Bangaly first argues that "the absence of any rules or standards led to confusion and, ultimately, what amounted to trial by ambush." Bangaly claims that, "[c]ontrary to the Circuit Court's repeated assertions to the parties, and much to plaintiff's surprise and prejudice, the '[posttrial] discovery' ultimately was not discovery at all but [amounted to] a disguised evidentiary hearing." This argument mischaracterizes the conduct of the actual proceedings before the court. The issue of the evidentiary nature of the proceedings was discussed frequently during the discovery proceedings. As just one example, during Wing's deposition, the court stated:

"Listen. I think I talked about this before. You know, this is [postjudgment] discovery. I'm concerned about the costs for both sides of having to do this. I've said all along that I'll be present for these deps because–for a couple reasons: One, to save costs, you know, to go do a discovery dep and another evidence dep or present live testimony before–You know, there's not going to be a jury here on this issue. I'm going to ultimately be whatever trier of fact I'm called upon to be. No one's made a motion. No one's moved the Court to do anything. I'm just an observer right now, really, calling some balls and strikes, I suppose. But you know, if you want to do discovery deps and then do evidence deps and double costs, you can do that. But I'm trying to prevent that and expedite this. You know, it's [postjudgment]. So that's why we're here. So it serves a dual role. I can stay between you guys so you don't scream at each other like you did in New York City when I wasn't there, and I was trying to do it by video conference that broke down repeatedly and, you know, save some time there as well, I suppose; and then I'll ultimately be asked to, you know, use it as an evidence dep, so to speak. I observed them testify. I was present for their testimony. So I don't know how they're going to be used."

This example is only one of many places in the record in which the court explained the dual nature of the proceedings it was conducting. While the trial court perhaps could have been clearer in expressly stating whether it was conducting an evidentiary hearing, the record leaves absolutely no doubt that the parties were well aware that the depositions they were conducting were going to be considered by the court in making its decision, without requiring the witnesses to appear before the court a second time. Implying that the posttrial discovery proceedings were in fact a "disguised evidentiary hearing" that occurred "much to [Bangaly's] surprise and prejudice" and "amounted to trial by ambush" is disingenuous. We do not find that Bangaly was surprised or prejudiced by the court's actions.

¶ 137 Moreover, Bangaly's reference to the court's denial of his request "for a short amount of additional time to complete an investigation regarding possible additional witnesses regarding Sissoko's and Keita's purported cohabitation as husband and wife" leaves out the facts that the request was made after discovery was closed, that Bangaly could not identify the supposed witnesses, and that the witnesses would testify that on "[m]ore than three occasions [Keita] was not seen with a woman when he might otherwise have been with a woman; and therefore, he wasn't cohabitating with her." We cannot find any error in the denial of a continuance to conduct this type of investigation when there was no concrete evidence to show that Sissoko and Keita did not cohabitate as husband and wife.

¶ 138    We also note that Bangaly's argument that he was denied the opportunity "to obtain any delineation of the evidence the Circuit Court considered in making its ruling" is contradicted by the record. At the hearing, the court expressly discussed with the parties what evidence was "fair game," because the court "want[ed] to make sure that there's no dispute as to what's properly before th[e] Court." The court determined that the depositions were properly before the court, because the witnesses testified live and were subject to cross-examination, including the pretrial depositions of Sissoko's parents. The parties also stipulated that, as to several affidavits, the named individuals would testify consistently with their affidavits; specifically, the stipulation referred to the affidavit of Tessougue for Bangaly, and Mamadou Keita, Ndaiye Keita, Moussa Keita, Judge Mamadou Diakite, and Sy Coulibaly for defendants. With regard to the certification of Bouram Sidibe, Bangaly stipulated to questions one and three, but did not stipulate to question two, which asked, "Is the marriage in accordance with the laws of Mali?" Thus, the record clearly shows what evidence was considered by the court and we cannot find any prejudice to Bangaly on this issue.

¶ 139    We also cannot find that Bangaly was prejudiced by the trial court's denial of his request to conduct a discovery deposition prior to Awad's evidence deposition. Prior to Awad's deposition, Ruder, Bangaly's counsel, asked to conduct a short discovery deposition before Awad's evidence deposition. The trial court asked why Ruder was requesting the discovery deposition, and Ruder responded:

> "I want to make sure that when I start cross-examining this witness, if you allow me to do so concerning these materials that I received the other day, that I don't draw an objection from Mr. Montgomery [defendants' counsel] on scope or things of that nature, which would not be a proper objection during a discovery deposition.
>
> And that's what I'm trying to limit here."

Montgomery immediately responded:

> "What this is, [Y]our Honor, is the traditional, Give me a copy of your billing memos, give me a copy of your engagement letter, what is your hourly rate, what correspondence have you had. We were requested to produce that just days ago. We produced it all to Counsel. And if he wants to inquire with respect to that, I'm not going to raise a scope of the examination objection."

Ruder responded: "That will save us some time," and raised no other issues concerning a preliminary discovery deposition. Thus, there is no indication that there was any other reason that Ruder sought a discovery deposition, nor does counsel on appeal provide any reason for such a proceeding. The only evidence in the record is that the concern underlying Ruder's request for a discovery deposition was alleviated by Montgomery's statement that he would not object to Ruder's cross-examination. Historically, in pretrial discovery, attorneys are given the opportunity to take a discovery deposition before an evidence deposition because the evidence deposition is the product that is used at trial, and the discovery deposition gives the opposing attorney the opportunity to find out what the witness will testify to before that witness testified in an evidence deposition. Here, there is no showing by Ruder that he was not aware of what the witness was going to testify to. He showed no surprise or prejudice. The trial court considered all the depositions in his decision-making process without regard to whether they were discovery or evidentiary. It would appear that when a trial court grants limited posttrial discovery the court can reasonably limit the discovery process. Accordingly, we can find no surprise or prejudice in the trial court's denial of Ruder's request.

¶ 140    Finally, we are not persuaded by Bangaly's argument that "notwithstanding the fact that Dr. Wing's evidence deposition was taken in the [posttrial] 'discovery phase,' the Circuit Court refused to allow plaintiff leave to supplement Dr. Wing's deposition testimony with her [a]ffidavit, by way of an offer of proof." Again, this argument fails to accurately represent the proceedings before the trial court. During Wing's deposition, the court sustained a number of objections concerning Wing's attempts to testify as to legal opinions. Several hours into the deposition, the court asked Wing to step out and asked Ruder to "[t]ell me what you want to do with this witness." After some discussion, Ruder stated:

> "The offer of proof will be that she will look at the registry of the marriage–the Marriage Registry of the Mayor's Office of Bamako, Pages 1 and 2 of the Marriage Certificate; and she will indicate whether or not there's any language on the document that indicates there is a proxy marriage or that someone is standing in for Mr. Keita. And she will do the same thing with the Declaration of Marriage. That's my offer of proof."

Thus, at the deposition itself, Ruder was asked for and provided an offer of proof as to Wing's proposed testimony. Later, when Bangaly attempted to supplement Wing's opinion with an affidavit that would serve as an offer of proof, that motion was denied both because Ruder had an earlier opportunity to make an offer of proof and because the court's opinion would not have changed even with the expanded offer of proof:

> "I ultimately did give you a chance to make an offer of proof, and it doesn't certainly go anywhere near this very legalistic [a]ffidavit that was eventually submitted as an exhibit. It was much more limited than that. And, like I said, if that would have been the offer of proof, just so the record is clear, for your benefit, if you would have made this offer of proof, this [a]ffidavit, my position would have been: She's giving legal opinions, conclusory opinions, without the basis to provide those sort of opinions to me and without the requisite qualifications, skill, expertise, or knowledge. And other than the conclusory claims that she has that sort of knowledge, it's not set forth in the [a]ffidavit. The basis of this ultimate knowledge–She's not a lawyer. She's not a judge."

Thus, the trial court's decision not to permit Bangaly to supplement Wing's testimony had nothing to do with any flaws in the discovery or evidentiary hearing process but instead was based on waiver and the contents of the proposed supplement itself. Accordingly, although it may have been unorthodox, we find no abuse of discretion in the way the trial court conducted the posttrial discovery and evidentiary hearing.

¶ 141                                II. Determination of Heirship

¶ 142    The next issue we consider is whether the trial court erred in determining that Keita was the sole heir of Sissoko's estate. Bangaly claims first that the trial court erred in admitting Awad's testimony and limiting Wing's testimony. Additionally, Bangaly claims that the trial court's conclusions that defendants rebutted the presumption that Sissoko's parents and siblings were her heirs, as well as its conclusion that Sissoko and Keita were validly married, were against the manifest weight of the evidence. "A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented." *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 70.

¶ 143

¶ 144    As an initial matter, before turning to the merits of Bangaly's arguments, it is helpful to set forth the language of the statutes that governed at the time of Sissoko and Keita's marriage, as well as providing a brief explanation of the court's authority to consider their marriage under Malian law. Under the Illinois Marriage and Dissolution of Marriage Act, "[a]ll marriages contracted *** outside this State[ ] that were valid at the time of the contract or subsequently validated by the laws of the place in which they were contracted or by the domicile of the parties, are valid in this State, except where contrary to public policy of this State." 750 ILCS 5/213 (West 2010). Such "Prohibited Marriages" include marriages entered into prior to the dissolution of an earlier marriage of one of the parties and incestuous marriages. 750 ILCS 5/212 (West 2010). While proxy marriages, such as the one between Sissoko and Keita, are not permitted under Illinois law (see *In re Estate of Crockett*, 312 Ill. App. 3d 1167, 1178 (2000)), that does not mean that they are not recognized and given full faith and credit by Illinois courts when contracted in other jurisdictions. For instance, while common law marriages are not permitted under Illinois law (750 ILCS 5/214 (West 2010)), common law marriages contracted in another state where they are valid are recognized (see *Allen v. Storer*, 235 Ill. App. 3d 5, 10 (1992)). Here, there is no indication that a proxy marriage in Mali would be contrary to Illinois public policy, and Bangaly does not argue that it would be. Thus, if the marriage of Sissoko and Keita was valid under Malian law, it will be considered valid in Illinois.

¶ 145    In considering Malian law, we note that, under the Uniform Judicial Notice of Foreign Law Act, Illinois courts cannot take judicial notice of the laws of foreign countries. 735 ILCS 5/8-1007 (West 2010). Thus, in Illinois, the laws of foreign countries must be pled and proven as any other fact. *Bianchi v. Savino Del Bene International Freight Forwarders, Inc.*, 329 Ill. App. 3d 908, 922 (2002); *Vrozos v. Sarantopoulos*, 195 Ill. App. 3d 610, 618 (1990); *Atwood Vacuum Machine Co. v. Continental Casualty Co. of Chicago*, 107 Ill. App. 2d 248, 262-63 (1969). However, the law of a foreign country "shall be an issue for the court," rather than one for the jury. 735 ILCS 5/8-1007 (West 2010); *Atwood*, 107 Ill. App. 2d at 262-63. In the case at bar, the parties, through Wing and Awad, have provided the Malian statutes at issue, as well as English translations, as the statutes are written in French. Additionally, there is no dispute between the parties concerning the actual language of the statutes or their translations. The only dispute is to the interpretation of that language. Thus, the trial court was properly allowed to consider the Malian statutes at issue. Furthermore, in considering laws of foreign countries, it is acceptable, and even desirable, for expert testimony to assist the court in the interpretation of such laws. See *Atwood*, 107 Ill. App. 2d at 262 (reversing the dismissal of a complaint because "[w]e are of the opinion that the trial court should have considered expert testimony and authorities as to the meaning of the Venezuelan statutes [at issue] before arriving at the determination" that the complaint did not state a cause of action). This assistance to the trial court was the purpose of Awad's and Wing's testimony, as well as Tessougue's affidavit.

¶ 146    Several Malian statutes are at issue in the instant case, and we set them forth here, translated from the original French.[17] First, article 10 of the Marriage and Guardianship Code (the Marriage Code) (Law No. 63-19 of Jan. 25, 1963) provides, in relevant part:

---

[17]The translated versions quoted here are the translations relied upon by Awad and were attached to defendants' brief concerning the issue of heirship. The translations of the Marriage Code include a declaration of accuracy certifying that they were translated by a French/English consultant at Atlas

"There is no marriage where there is no consent.

Consent must be made orally and in person before the civil status officer by each spouse. It is evidenced by signature, or otherwise, by the affixing of fingerprints at the bottom of the certificate. However, in cases of distance, if one of the intending spouses resides outside of the place where the marriage is to be celebrated [and] is unable to appear personally before the civil status officer, the party so prevented may consent by a deed drafted by the civil status officer for his residence. The act is transmitted by that authority to the civil status officer for his residence.

The marriage must necessarily be celebrated in this case before a duly authorized representative of the prevented spouse. This representative must sign or failing to affix his fingerprints at the foot of the marriage certificate."

¶ 147     The nine articles of chapter VI of the Marriage Code concern the formalities of the marriage and provide, in relevant part:

"Art. 16 The wedding shall be celebrated publicly before the civil status officer nearest the domicile of one of the parties.

Art. 17 Fifteen days before the celebration, the publication shall be carried out at the domiciles of the future spouses and at the place of marriage. This publication shall be carried out either by notice posted at the door of the common house or the offices of the head of the administrative district, or by other appropriate means of publication.

The first and last names, residences, occupations, ages of bride and groom and the date of celebration shall be mentioned.

Art. 18 Anyone who has legal authority may, within that deadline, oppose the celebration of the intended marriage without the consent required in the previous chapter. ***

* * *

Art. 21 If there was no opposition or if the opposition was rejected, the civil status officer shall conduct the marriage ceremony.

The celebration takes place in the presence of two witnesses.
***

Art. 23 The civil status officer reads to the future spouses Articles 7, 8, 32, 34 and 35 of this Law.

He asks them if there was a marriage contract. Mention of the response shall be made on the marriage certificate indicating the date and place of the contract and the officer who received it.

He ensures the consent of the intending spouses subject to the penalties provided for in Article 104 of the Penal Code.

Following all these formalities, he declares them united by the bonds of matrimony.

Art. 24 The marriage certificate shall state:

1. the first and last names, ages and occupations, domiciles or residences of the spouses;

---

Language Services, Inc. The other statutes do not indicate how they were translated. There is no dispute, however, between the parties as to the accuracy of any of the translations.

2. the first and last names, occupations, domiciles of the mothers and fathers of the spouses;

3. the consent of the fathers and mothers or legal guardians, in cases where this consent is required;

4. the first and last names of the witnesses and the indication that they are adults;

5. the declarations of the contracting parties that they take each other as spouses and the pronouncement of their union by the civil status officer;

6. the declaration concerning the marriage contract;

7. possibly the first and last names of previous spouses;

8. the full or partial payment or the non-payment of the dowry and the time allowed for this purpose;

9. possibly the commitment to monogamy under Article 43 below (Law No. 63-19 of January 25, 1963) or the notarized deed by which one of the prevented parties has consented."

¶ 148    Chapter VII of the Marriage Code concerns "Nullity of Marriage" and provides, in relevant part:

"Art. 25 Marriages are invalid that are contracted in violation of Articles 7, 8 and 9 [concerning multiple spouses and incestuous relationships] above, without prejudice to prosecution under the penal code.

\*\*\*

Art. 26 The marriage that was contracted without the free consent of both spouses or of one of them can only be disputed by the spouses or by the one whose consent was not free.

When there was mistaken identity, the marriage can only be disputed by the spouse who was misled.

Art. 27 A marriage contracted without the consent of qualified persons within the meaning of this law can only be attacked by those whose consent was necessary.

However, these persons can not take legal action for annulment when they expressly or tacitly approved the marriage or when a two month period has elapsed since they became aware of the marriage without their complaining.

Art. 28 Any marriage that was not celebrated in accordance with the provisions of Articles 16 and 17 above, or which was not celebrated before the competent official, can be attacked by all who have an interest as well as by the public prosecutor regardless of the time of the marriage, as long as they were not informed, and if there have not been any children born of this union.

\* \* \*

Art. 31 A marriage that has been declared null and void, nevertheless produces civil effects both with regards to the spouses as well as in respect of the children, when it was contracted in good faith.

If good faith exists only on the part of one of the spouses, the marriage only produces civil effects in favor of that spouse and the children from the marriage."

¶ 149    In addition to the Marriage Code, several other Malian statutes are relevant to the case at bar. The Civil Status Code (Law No. 87-27/AN-RM of Mar. 16, 1987) sets forth several

provisions explaining the duties of "civil service officers." Article 10 of the Civil Status Code provides:

> "The civil status officers are the persons appointed in the civil status centers to prepare and sign civil status records, celebrate marriages, and preserve and transmit the civil status documents."

With regard to marriages, article 96 of the Civil Status Code provides:

> "The civil status officer called to celebrate the marriage must ensure that the substantive and formal requirements of the law are met. To that end, he must hold before marriage:
>
> • the birth certificate of the spouses of the document in lieu thereof;
>
> • possibly, the decision of the Minister of Justice granting an age exemption;
>
> • possibly, the certificates of no objection issued by the civil status officers for the other places of publication and, where appropriate, the decision of head of the administrative district rejecting the opposition;
>
> • the record of consent of the parents, guardian or head of the administrative district, if the spouses have not attained the age of 21 years for the boy and 18 years for the girl. However, consent may however be given verbally during the celebration;
>
> • possibly, the death certificate for the last spouse or the document in lieu thereof;
>
> • possibly, the certificate of divorce or annulment of the previous marriage."

Finally, article 98 provides:

> "The marriage is celebrated publicly by the civil status officer. The date is set by the latter.
>
> Spouses or their duly mandated representatives must be present and assisted by two adult witnesses."

¶ 150    Finally, the General Regime of Obligations (Law No. 87-31/AN-RM of Aug. 29, 1987), which "[u]nless otherwise provided, *** applies equally to civil and commercial obligations," contains several provisions relevant to the case at bar. Section III concerns "Penalties for Rules on the Formation of Contracts" and provides, in relevant part:

> "ART. 61 Failure to comply with a condition of contract formation makes it invalid.
>
> Invalidity must be recognized in court. It can be either relative or absolute.
>
> When pronounced, the act is retroactively wiped out.
>
> ART. 62 Nullity is absolute where the conditions imposed by law are essential to protect the public interest or public order and good morals.
>
> Absolute nullity may be invoked by any interested person. It must be invoked in any case by the prosecution or automatically raised by the judge.
>
> The deed bearing absolute nullity can not be confirmed.
>
> An action for absolute nullity is subject to the common law limitation.
>
> The exception of nullity survives the statute of limitations.
>
> ART. 63 Relative nullity resulting from the breach of rules designed to protect a private interest, such as the provisions concerning defects of consent, incapacities of protection and injury.

Only the person protected by the law may invoke the relative nullity.

They may be covered by express or tacit confirmation.

ART. 64 An action for nullity shall lapse after five years from the day of contract formation. This deadline, however runs in cases of incapacity or violence from the day when these stopped, in cases of error or fraud from the day when the defect was discovered.

ART. 65 An act bearing relative nullity can be confirmed expressly or tacitly by the person who could seek its annulment. Confirmation must take place knowingly and after cessation of the vice.

The confirmation causes the original vice to retroactively disappear without affecting the rights of third parties."

### B. Testimony of Awad and Wing

Bangaly claims first that the trial court erred in admitting Awad's testimony and limiting Wing's testimony. Both testified in order to provide the trial court with guidance as to the interpretation of Malian law, Awad for defendants and Wing for Bangaly. However, the trial court relied heavily on Awad's opinion and limited Wing's testimony. Bangaly claims that both these decisions were erroneous.

### 1. Expert Testimony Generally

"A person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons, and where his testimony will aid the trier of fact in reaching its conclusions." *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006) (citing *People v. Miller*, 173 Ill. 2d 167, 186 (1996)). " 'There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research.' " *Thompson*, 221 Ill. 2d at 428-29 (quoting *Miller*, 173 Ill. 2d at 186).

A trial court deciding whether to allow expert testimony should focus on five basic questions. First, the testimony must be relevant to a material fact in the case. *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993) (no abuse of discretion in excluding on relevancy grounds testimony relating to an expert's experiences with other victims). Second, it must be shown that the testimony would assist the court in determining a fact in issue. *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 153 (2001). Third, the witness must be qualified to give such testimony. *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 361 (1979). Fourth, the testimony must be reliable and have a proper basis for the opinion to meet foundational requirements. *Soto v. Gaytan*, 313 Ill. App. 3d 137, 148 (2000) (treating chiropractor's opinion as to permanency of plaintiff's injuries did not bear "sufficient indicia of reliability for submission to the jury," since the opinions must be generally accepted in the community). Fifth, the probative value of the testimony must not be substantially outweighed by the dangers of confusion, undue consumption of time, or unfair prejudice. *People v. Davis*, 335 Ill. App. 3d 1, 17 (2002).

In the case at bar, there is no question that the issue of whether the marriage was valid under Mali law was relevant. Further, there is no question that the validity of the Malian marriage was an important issue in the case and an understanding of Malian law was the

vehicle that would give the court the ability to make that decision. Instead, the issues in the case at bar concern the third and fourth questions outlined above; the qualifications of Awad and Wing are major issues in Bangaly's argument here, as is the basis for their opinions, and we discuss them below.

¶ 157   The decision of whether to admit expert testimony is within the sound discretion of the trial court. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). Accordingly, it is reviewed for an abuse of discretion. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 27 (2008). As noted, a trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy*, 207 Ill. 2d at 177.

¶ 158                                                                2. Awad

¶ 159   Bangaly first argues that the trial court erred in permitting the opinions of Awad, whom Bangaly describes as "a New Jersey lawyer who had no knowledge of Malian law other than having reviewed English translations of certain provisions of the Malian Marriage Code in order to render the 'opinions' reflected in his report and at his deposition." Bangaly argues that Awad had no specialized knowledge that would be at all relevant to analyzing Malian law and, therefore, he should not have been considered an expert in Malian law. We do not find this argument persuasive.

¶ 160   Awad testified that he had extensive experience in international matrimonial law, including North African countries. Awad testified that his coursework at the University of London School of Oriental and African Studies included studies of "all legal systems that were part of the British empire. We studied the African legal system; we studied the Islamic legal system; we studied the civil law system; and we studied the common law system understanding how these systems intersect, how they are similar, dissimilar and what have you"; Awad testified that the African systems he studied included Mali, and that in order to know and understand the current Mali code, it was important to understand "how the tribal custom, traditional Islamic law and French law intersect."

¶ 161   Awad further testified that in law school, he was a member of the international law review and studied international constitutions, especially countries from the Middle East, and that the primary area of focus in his practice was international family law matters. Awad taught Islamic jurisprudence matrimonial litigation at Rutgers Law School, and was also a fellow of the International Academy of Matrimonial Lawyers. While Awad admitted that he had never testified specifically on Mali, he testified that "West Africa and the Middle East[ ] *** are civil law-based countries. They *** almost have identical codes, whether they're the civil codes that are identical or their family codes. Mali, of course, has a code that's similar to many other West African countries." Awad further testified that "[m]y training and understanding of how to read these codes in these various countries, neighboring countries of Mali, knowing the historical context of these countries, knowing their tribal customs and being a matrimonial lawyer who is seasoned, been practicing 13, 14 years, involved in many international issues involving validity of marriages in many, many countries, that all combined gives me a unique insight and an ability to understand validity of marriage issues that very few lawyers can do what I have." Given these qualifications, we cannot find that the trial court abused its discretion in determining that Awad was qualified to testify as to Malian matrimonial law.

¶ 162   We do not find persuasive Bangaly's reliance on other cases in which experts were not properly qualified, as those cases are factually quite different than the case at bar. For instance,

in *Stehlik v. Village of Orland Park*, 2012 IL App (1st) 091278, ¶ 29, the appellate court found that the trial court did not abuse its discretion in finding that an expert failed to provide a sufficient foundation for his opinion where "plaintiffs' expert offered no specifics regarding his firsthand experience with showup procedures; much less with ones comparable to the facts presented here." Here, by contrast, Awad testified about his specific qualifications in international matrimonial law. We also note that the *Stehlik* court was presented the issue of expert testimony from the opposite viewpoint as in this case: there, the court was asked to determine whether the trial court abused its discretion in refusing an expert opinion while, here, we are asked to determine whether the trial court abused its discretion in permitting the expert opinion. Given the deferential standard of review, such a distinction is significant.

¶ 163    Similarly, the situations present in *Broussard v. Huffman Manufacturing Co.*, 108 Ill. App. 3d 356 (1982), and *Galindo v. Riddell, Inc.*, 107 Ill. App. 3d 139 (1982), are distinguishable from that in the case at bar. In *Broussard*, the appellate court found that the trial court had abused its discretion in admitting the testimony of an expert who testified as to defects in the design and manufacture of two-gallon gasoline cans, where the expert had no degree or training in mechanical engineering, had never designed or manufactured gasoline cans, and had no special knowledge of combustion, ignition sources, or the grade of metal used in the can. *Broussard*, 108 Ill. App. 3d at 362. The court noted that "[w]e recognize that gasoline is a hazardous substance. Likewise, we recognize that a railway tank car that transports hazardous substances [with which the expert had familiarity] is similar, in a sense, to a two-gallon gasoline can. The differences, however, outweigh the similarities. We find the similarities too remote for the great credibility ultimately placed upon an expert's opinion." *Broussard*, 108 Ill. App. 3d at 362. In *Galindo*, the appellate court likewise found that the trial court abused its discretion in admitting the testimony of a former professional football player with a bachelor's degree in mechanical engineering to testify that the rear rim of a football helmet did not cause a cervical spine injury. *Galindo*, 107 Ill. App. 3d at 146. The court noted that "[i]t was never established that being a professional football player or being a mechanical engineer gave [the expert] the expertise to analyze the cause of a football injury, and no testimony was given to indicate that he ever utilized engineering skills to determine the causation factors of football injuries." *Galindo*, 107 Ill. App. 3d at 146.

¶ 164    Unlike the situations present in *Broussard* and *Galindo*, Awad here testified as to his qualifications to interpret Malian matrimonial law specifically. He had extensive experience in the area of international matrimonial law, including the law of a number of countries similar to Mali. Additionally, his studies included the study of Mali, even though he had never had a client there. Awad also testified to the basis for his opinion by explaining the similarities between Mali and the systems he had studied more extensively and pointed to specific sections of the Malian statutes that supported his opinions. Thus, we cannot find that the trial court abused its discretion in permitting Awad to testify.

¶ 165    We also find Bangaly's argument that Awad's testimony "constituted his personal opinions on how to interpret the language of (the English translations) of the provisions of the Malian Marriage Code" to be unpersuasive. While Awad opined as to the interpretation of Malian laws, an attorney is permitted to do so when dealing with foreign law. See *Town of the City of Bloomington v. Bloomington Township*, 233 Ill. App. 3d 724, 735 (1992) ("A court should not permit opinion on a question of law [citations] unless the court is dealing with a question of foreign law. [Citation.]"). Furthermore, as noted, in considering laws of foreign

countries, it is acceptable, and even desirable, for expert testimony to assist in the interpretation of such laws. See *Atwood*, 107 Ill. App. 2d at 262 (reversing the dismissal of a complaint because "[w]e are of the opinion that the trial court should have considered expert testimony and authorities as to the meaning of the Venezuelan statutes [at issue] before arriving at the determination" that the complaint did not state a cause of action). Finally, we must note that this argument would equally apply to the testimony of Wing and the affidavit of Tessougue, both of whom offered interpretations of the Malian Marriage Code. The only difference between the three is that Awad could not read French and, therefore, formed his opinions based on the English translation of the statute; however, as noted, there is no claim that the translations relied on by Awad were in any way inaccurate. Accordingly, we cannot find that the trial court abused its discretion in admitting Awad's testimony.

¶ 166                                    3. Wing

¶ 167    Bangaly also argues that the trial court improperly limited Wing's testimony and prevented her from testifying as to her interpretation of the Malian Marriage Code. He claims that, given the rest of her qualifications, the mere fact that she was not an attorney should not have prevented her from testifying as to her interpretation of the Marriage Code. We do not find this argument persuasive.

¶ 168    We first note that despite Bangaly's contention, Wing was not "permitted *** to testify to little more than her translation of the Malian Marriage Code from French to English." It is true that, during her testimony, the trial court sustained a number of objections on the basis that the questions asked sought legal opinions. However, Wing was permitted to testify that the marriage documents did not contain any indication that the marriage was a proxy marriage, although such a marriage was permitted under Malian law. Wing also testified that "many Malians believe they are undergoing marriages when in fact those marriages have no legal significance or recognition by the state. It's a common problem in Mali." Thus, Wing was permitted to testify as to more than simply a translation.

¶ 169    Furthermore, we cannot find that the trial court erred in finding Wing unqualified to render a legal opinion. "Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). Wing testified that she was not a lawyer and was not authorized by any law to give legal opinions with respect to the interpretation of a legal statute. Thus, the court could properly have found that she did not possess the requisite expertise in interpretation of Malian law. Moreover, the trial court could likewise have properly found that the opinions of a nonattorney would not assist the court, the trier of fact, in interpreting the Malian Marriage Code. Thus, we cannot find that this decision was an abuse of discretion.

¶ 170    We are unpersuaded by Bangaly's citation of *Ruffin v. Boler*, 384 Ill. App. 3d 7 (2008), which he cites to as support for his argument that "the Court must address whether the expert's area of expertise relates to the opinions provided, and *** it should not determine an expert's qualifications based on pre-conceived ideas of the type of education or background the expert should possess." *Ruffin* merely found that a biomedical engineer was qualified to testify that an injury suffered at childbirth was the result of a cause other than the defendant doctor's negligence. *Ruffin*, 384 Ill. App. 3d at 21. However, Bangaly has pointed to no case in which a nonattorney was permitted to testify as to his or her legal opinions.

¶ 171    The trial court in the case at bar made it clear that it had expected Wing to testify to the social and political context of Malian marriages, a subject in which she was unquestionably qualified. However, it drew the line when she attempted to testify to legal opinions. We cannot say that this decision constituted an abuse of discretion.

¶ 172                              C. Determination of Heirship

¶ 173    Next, Bangaly argues that the trial court erred in determining that defendants had rebutted the presumption that Sissoko's parents and siblings were her heirs, and also erred in determining that Keita was Sissoko's husband and, therefore, her sole heir.

¶ 174    The trial court's determination that defendants had rebutted the presumption of heirship and that Keita was Sissoko's heir will not be overturned unless it was against the manifest weight of the evidence. See *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 68 (considering the denial of the petitioner's motion to amend heirship under the manifest weight standard). "A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented." *Bennoon*, 2014 IL App (1st) 122224, ¶ 70.

¶ 175    In the case at bar, on November 21, 2007, the probate court entered an order declaring that Sissoko's parents and siblings "are the only heirs of the decedent." This order was based on an affidavit of heirship executed by Bangaly, in which he stated that "HAWA SISSOKO was never married and never had nor adopted any children during her lifetime." Under the Probate Act of 1975 (the Probate Act), "[a]n order of the court declaring heirship is prima facie evidence of the heirship." 755 ILCS 5/5-3(c) (West 2010). Thus, the existence of an order of heirship establishes a presumption of heirship that affects the burden of producing evidence. *In re Estate of Severson*, 107 Ill. App. 3d 634, 636 (1982). However, the existence of an order of heirship does not shift the burden of persuasion to the party challenging the heirship to "prove the negative." *Estate of Severson*, 107 Ill. App. 3d at 636. "As in any civil proceeding, the burden of proof in an heirship controversy rests with the party claiming heirship, because the claimant is asserting the affirmative issues." *Estate of Severson*, 107 Ill. App. 3d at 636.

¶ 176    Thus, in the case at bar, the order of heirship established a presumption that Sissoko's parents and siblings were Sissoko's heirs. In challenging that heirship, defendants did not have to *prove* that Sissoko's parents and siblings were not her heirs but only had the burden of producing evidence to rebut the presumption. The burden of proof on the issue remained with Bangaly, as the administrator of Sissoko's estate and the party affirmatively claiming that Sissoko's parents and siblings were Sissoko's heirs.

¶ 177    In the case at bar, the trial court found that defendants had successfully produced sufficient evidence to rebut the presumption of heirship. The court noted that there was no dispute that a ceremony had occurred and that the purpose of the ceremony was a marriage between Keita and Sissoko. The court further pointed to Keita's testimony, photographs of Sissoko and Keita, and testimony that this was an arranged marriage in which the families knew each other. The court concluded that "there is competent evidence that's been put forward to this Court from the testimony of Mr. Keita himself that refuted and rebuts, I should say, the presumption that at the time of her death, she was not married," and also pointed out that "the divorce decree itself perhaps is the best evidence of marriage in this case," since it indicated that the community in Mali believed that Sissoko and Keita were married and that such a document was required in

order for Sissoko's parents and siblings to be able to recover under the lawsuit. We cannot find that this conclusion was against the manifest weight of the evidence.

¶ 178 Bangaly points to the court's reliance on Keita's testimony and argues that "Keita's testimony was obviously biased, riddled with inconsistencies and frequently simply incomprehensible" and further argues that "Keita obviously had a motive to try to persuade the Circuit Court that he had been validly married to Sissoko." However, "the court is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility, and to determine the weight their testimony and the other trial evidence should receive." *Bennoon*, 2014 IL App (1st) 122224, ¶ 72. "For that reason, we may not substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Tully v. McLean*, 409 Ill. App. 3d 659, 670-71 (2011). In the case at bar, the trial court was present when Keita testified through videoconference, so it was able to observe Keita testifying and determine his credibility, and we will not disturb that credibility determination. Moreover, the trial court also noted other evidence that supported its determination that the presumption had been rebutted, including the presence of the divorce decree. Given that defendants were only required to produce sufficient evidence to rebut the presumption that Sissoko's parents and siblings were her heirs, we cannot find the trial court's conclusion that they did rebut the presumption to be against the manifest weight of the evidence.

¶ 179 Additionally, we cannot find that the trial court's conclusion that Keita was Sissoko's husband and, therefore, her sole heir was against the manifest weight of the evidence. Section 5-3(c) of the Probate Act provides that "any *** legal method of proving heirship may be resorted to by any party interested therein in any place or court where the question may arise." 755 ILCS 5/5-3(c) (West 2010). Additionally, "[a] marriage which may have been celebrated or had in any foreign state or country, may be proved by the acknowledgement of the parties, their cohabitation, and other circumstantial testimony." 750 ILCS 5/409 (West 2010). In the case at bar, evidence of the marriage and Keita's heirship was presented through deposition testimony, affidavits, and the exhibits containing the marriage documents.

¶ 180 The trial court thoroughly explained the basis for its decision concerning heirship, which is quoted in its entirety above, and we will not repeat it here. *Supra* ¶¶ 103-04. In summary, however, the court found that, under Malian law, Keita was the only party with the right to challenge the validity of the proxy marriage, as he was the individual whose consent was at issue. The court acknowledged Bangaly's arguments concerning the technical deficiencies of the marriage certificate but stated that finding the marriage void was "certainly not the remedy." Moreover, the court noted that any challenge to the marriage needed to be made within two months by one with the right to challenge it–which the court explicitly found did not include Sissoko's parents or siblings. The court also noted again that it was undisputed that a ceremony had occurred and that the parties intended to marry, as evidenced by the testimony of Sissoko's parents. We cannot find the trial court's thoughtful consideration of the issue and ultimate conclusion that the marriage was valid to be against the manifest weight of the evidence.

¶ 181 Bangaly argues that in reaching its conclusion, the trial court relied heavily on Awad's testimony and disregarded Wing's testimony and Tessougue's affidavit. However, the trial court's decision-making process was not improper. We have explained above that the trial court did not abuse its discretion in limiting Wing's testimony. Additionally, as to Awad, the

trial court explained why it relied on his testimony when it denied Bangaly's motion to bar his testimony:

"I found Mr. Awad to be a very intelligent, very capable, and very knowledgeable individual. I was impressed by the manner and demeanor in which he testified. He was posed questions on both Direct and Cross Examination and Redirect and Recross Examination and was an impressive witness in terms of his ability to answer questions that were posed to him by very talented and capable attorneys on issues that pertain to divorce law, matrimonial law, and the application of Malian law to the circumstances of this case, which involve a claim that a man in New York, Mr. Keita, was marrying Hawa Sissoko, who was in Mali, by proxy marriage at a time quite a while ago.

I found him to be a rather convincing witness in terms of his demeanor and the ability with which he was familiar with the issues in this case that came at him from a number of different angles, so to speak. His proficiency in the area is clearly evident. I do believe he has a certain level of experience and knowledge that this Court perhaps–and any other Court, for that matter, might find helpful on the issues that are before it. So I believe that he crosses the threshold of displaying and having the requisite knowledge, experience, education, and training that would assist this Court on the matters before it that pertain to matrimonial law, Malian law; and so accordingly, I'll accept him as an expert in this area.

And I am mindful of the fact that the Plaintiffs note that much of his testimony is just, you know, regurgitating, if you will. I don't mean to diminish it, but re-presenting, if you will, what is explicitly stated in the Malian code that both sides agreed is in full force and effect at the time in question. So because these parties–the parties here are not in dispute as to the applicability, the interpretation of that code and those code provisions which are before this Court, that is another reason why I am making the finding that I am.

There's no one on the other side, if you will, who has testified otherwise with respect to much of what Mr. Awad has put forward. I do know there are some disputes, though, as to the manner in which this marriage or the purported marriage was performed. And so I'll accept him as an expert in this area, and his testimony will stand. And you can argue its weight or its persuasiveness as you wish."

Additionally, when Bangaly argued that the court's decision was against the manifest weight of the evidence, the court explained why it did not rely on Tessougue's affidavit:

"I wasn't convinced at all by professor/lawyer/judge Tassougue's [*sic*] affidavit that was very conclusory and contained much watered-down language in the face of the history of the relationship between these two individuals, two families in a traditional Malian society who recognized a marriage, a ceremony that was performed, a wedding dress, cohabitation, movement from Mali to the United States.

In essence, the response that this was technically violative of Malian procedures or Malian statutes didn't carry any weight and, you know, that's, in essence, what I ruled. If you aren't aware of it, that's what I've ruled."

As noted, "the court is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility and to determine the weight their testimony and the other trial evidence should receive" (*Bennoon*, 2014 IL App (1st) 122224, ¶ 72), and "we may not

substitute our judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn" (*Tully*, 409 Ill. App. 3d at 670-71). Here, the trial court thoroughly explained its decision to rely on Awad's testimony over that of Bangaly's experts, and we will not second-guess that decision.

¶ 182    Moreover, the trial court's conclusions appear to comport with the language of the Malian statutes at issue, as set forth at the beginning of this section. See *supra* ¶¶ 144-48. Chapter VII of the Marriage Code specifically provides that problems concerning a party's consent can only be raised by the party whose consent is at issue, here, Keita. Additionally, the same chapter places a two-month limitations period on seeking annulment and states that a legal action for annulment is not available when the person whose consent is at issue "expressly or tacitly approved the marriage." Here, there is no dispute that Keita is not challenging his consent and, in fact, affirmatively stated that he and Sissoko were married; additionally, the two-month period to challenge the 1998 marriage has long since passed. Thus, we can find no error in the trial court's conclusions.

¶ 183    Furthermore, there is support in the Malian statutes for the trial court's conclusion that any technical defects rendered the marriage voidable, not void. The General Regime of Obligations discussed "relative nullity," which resulted "from the breach of rules designed to protect a private interest, such as the provisions concerning defects of consent, incapacities of protection and injury," and provided that only the person protected by the law could invoke the relative nullity and that the defects "may be covered by express or tacit confirmation." The same statute also provides a five-year limitations period for actions for nullity, again, a time period which has long since lapsed. In short, the trial court thoroughly explained its reasoning, which is supported by evidence in the record, and we cannot find that its ultimate decision was against the manifest weight of the evidence.

¶ 184                    III. Vacating Judgment as to Liability and Damages

¶ 185    We next consider the first of Keita's issues on appeal: whether the trial court erred in vacating the judgment as to liability as well as damages. "The decision to grant or deny a motion to vacate is at the discretion of the trial court and will not be reversed on review absent an abuse of that discretion." *Green v. Board of the Municipal Employees', Officers' & Officials' Annuity & Benefit Fund*, 309 Ill. App. 3d 757, 763 (1999). As noted, a trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." *Dawdy*, 207 Ill. 2d at 177.

¶ 186    In the case at bar, the court vacated the judgment as to both liability and damages, finding:

> "I'm going to set aside not only the damage portion of the judgment, but also the liability portion of the judgment for initial reasons that relate to, I believe that the Defendants here were denied the ability to put forward all favorable evidence on the issue of liability, particularly as it revolves around what sort of relationships Hawa had in her life. Set aside the fact that the Court found the family of Hawa, her parents and her siblings, were not proper parties. The Defendants were denied the ability, by virtue of Mr. Bangaly, who I find to be a completely incredible–perhaps the most incredible witness in this case. By his design and his persistence, they denied–he denied on behalf of Hawa's parents and siblings the Defendants [the] ability to fully defend this case with what could have been in the jury's estimation an important piece of evidence, namely that she in fact was married, and arguably the marriage hadn't gone well, which

- 48 -

forced her to move to Chicago for at least two years outside, away from her husband, living in her uncle's house, braiding hair here for some reason, that she evidently couldn't braid back in New York. But nevertheless, they denied the Defendants the ability to put that evidence before the jury and asked them to find her act out there was an intentional act of suicide or, alternatively, to engage in what jurors do when they decide these cases and blend the liability evidence with the eventual damage evidence in the way only they can, especially in a case involving contributory negligence as a theory put forward by the defense.

So accordingly, I have no way, without prejudicing the Defendants in this case, to set aside just the damage portion of this judgment without setting aside the liability aspects of it. I would note that this Court or any Court, if it was presiding over this case again, would in essence have to try the case once again; and I think that vacating both damages and liability here certainly doesn't waste any additional judicial resources. The Court's going to have to hear it anyhow.

I would note too that it would just be an awkward way to try the case, to somehow have to either keep the 15 percent contributory negligence determination as some sort of offset against an admitted liability or Court-directed liability finding for the new jury to consider damages. That would be a bit strange and odd. And accordingly, I can't bifurcate that. So it's vacated in its entirety."

¶ 187    The main issue here is not whether the court erred in vacating the damages portion of the judgment but, instead, whether the trial court should have vacated the judgment as to liability as well. Keita draws an analogy to the analysis a trial court performs when determining whether to grant a new trial as to damages alone, and we agree that such an analogy is helpful in determining the propriety of the trial court's actions in the case at bar. When a court finds that a jury has erred in its calculation of damages, it has the option of ordering a new trial limited to the issue of damages "where (i) the jury's verdict on liability is amply supported by the evidence, (ii) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant, and (iii) the record suggests neither that the jury reached a compromise verdict, nor that, in some other identifiable manner, the error which resulted in the jury's awarding inadequate damages also affected its verdict on the question of liability." *Sheth v. SAB Tool Supply Co.*, 2013 IL App (1st) 110156, ¶ 83; see also *Hollis v. R. Latoria Construction, Inc.*, 108 Ill. 2d 401, 408 (1985).

¶ 188    In the case at bar, Keita argues that the jury's verdict as to damages was completely separate from its verdict as to liability and that there is no reason to vacate the judgment as to liability. Keita's argument might be persuasive, if not for the fact that Sissoko's contributory negligence was an issue during the liability portion of the trial. Defendants' strategy at trial in part focused on the theory that Sissoko was committing suicide by standing in the middle of a lane of traffic on the Indiana Tollway. The trial court found that defendants were prejudiced by not being able to argue Sissoko's failed marriage to the jury, which could have altered the jury's calculation of fault. Thus, the issue of Sissoko's marriage was not solely limited to the damages portion of the verdict, but impacted the liability portion as well. We cannot find that the trial court abused its discretion in reaching this conclusion and determining that the

judgment as to liability needed to be vacated as well.

¶ 189                    IV. Dismissal of Case With Prejudice
¶ 190      The final issue we are asked to consider is the trial court's decision to dismiss the case in its entirety with prejudice and the related denial of Keita's request to amend the complaint. Both Bangaly and Keita take issue with the trial court's determination that Sissoko's and Keita's families committed a fraud on the court, and Keita also argues that his intervention in the case was timely. We review the trial court's dismissal of the case *de novo*. *Lutkauskas v. Ricker*, 2013 IL App (1st) 121112, ¶ 18. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 191               A. Dismissal as to Sissoko's Parents and Siblings
¶ 192      In the case at bar, the trial court dismissed the case with prejudice as to the claims of Sissoko's parents and siblings due to its finding that "this family clearly engaged in an orchestrated fraud upon the Court from the inception of this case." However, "[t]his court may affirm the circuit court's dismissal for any reason appearing in the record." *Lutkauskas*, 2013 IL App (1st) 121112, ¶ 18. Here, regardless of the propriety of the court's finding of fraud, the record reveals an alternate basis for affirming the dismissal.

¶ 193      Under the Wrongful Death Act, "[e]very such action shall be brought by and in the names of the personal representatives of such deceased person, and, except as otherwise hereinafter provided, the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person and in every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, to the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2 (West 2006). A decedent's next of kin for purposes of the Wrongful Death Act is determined by looking to the laws of intestacy. *Morris v. William L. Dawson Nursing Center, Inc.*, 187 Ill. 2d 494, 497 (1999). Under section 2-1 of the Probate Act, if there is a surviving spouse and no descendant of the decedent, the decedent's entire estate shall be distributed to the surviving spouse. 755 ILCS 5/2-1(c) (West 2006). Thus, in the case at bar, since the trial court found that Keita and Sissoko were married at the time of her death, Keita was Sissoko's next of kin for purposes of the Wrongful Death Act and was the sole and only individual able to recover under the Wrongful Death Act.

¶ 194      "In order to maintain a claim under the Wrongful Death Act, [a] plaintiff must allege: (1) [the] defendant owed a duty to the decedent; (2) [the] defendant breached that duty; (3) the breach of duty proximately caused the decedent's death; and (4) that pecuniary damages occurred to persons designated under the Wrongful Death Act." *Rodgers v. Cook County, Illinois*, 2013 IL App (1st) 123460, ¶ 31. In the case at bar, however, the complaint alleges "[t]hat HAWA SISSOKO left surviving her parents Diaguila [*sic*] Sissoko and Goundo Dembele; and her brothers and sisters[,] *** all of whom are lawful heirs of the Estate of HAWA SISSOKO"; the complaint makes no mention of Keita. Since Sissoko's parents and siblings were not "persons designated under the Wrongful Death Act" (*Rodgers*, 2013 IL App (1st) 123460, ¶ 31), that necessary element is missing from the complaint. Accordingly, the complaint naming Sissoko's parents and siblings as heirs failed to state a claim under the

Wrongful Death Act, meaning that dismissal of the case was appropriate. See *Maga v. Motorola, Inc.*, 163 Ill. App. 3d 524, 530 (1987) (finding that dismissal of the portions of a wrongful death complaint naming parents and siblings under section 2-615 was appropriate where the decedent had a surviving spouse and, therefore, parents and siblings were not next of kin); see also *Mio v. Alberto-Culver Co.*, 306 Ill. App. 3d 822, 827 (1999) (finding that lawsuit of the decedent's parent was properly dismissed under section 2-619 due to the parent's lack of standing where the decedent was survived by a spouse). Accordingly, we affirm the dismissal of the case as to Sissoko's parents and siblings.

¶ 195                      B. Refusal to Permit Keita to Amend Complaint

¶ 196    In the case at bar, although the court stated that it was "dismiss[ing] this case against not just the Sissokos and Mr. Bangaly, but against Mr. Keita as well," technically, since Keita was only an intervenor and not a party to the complaint,[18] what the trial court did with regard to Keita was to deny his request to amend the complaint to substitute Keita as Sissoko's heir, as evidenced by the court's written order. Thus, we are reviewing not just the dismissal of the complaint, which we have addressed with regard to Sissoko's parents and siblings above, but the denial of a motion to amend the complaint.

¶ 197    In the case at bar, Keita sought amendment after the entry of judgment on the jury's verdict and, on appeal, he argues that he should have been permitted to amend the complaint pursuant to section 2-616(c) of the Code, which permits a pleading to be amended at any time, before or after judgment, "to conform the pleadings to the proofs." 735 ILCS 5/2-616(c) (West 2010). "After final judgment, a plaintiff has no statutory right to amend a complaint and a court commits no error by denying a motion for leave to amend." *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 14. "The reason is that although section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2010)) provides that '[a]t any time before final judgment amendments may be allowed on just and reasonable terms,' there is no corresponding provision mandating similar latitude in amendments offered *after* final judgment has been entered. Following judgment, a complaint may only be amended in order to conform the pleadings to the proofs. See 735 ILCS 5/2-616(c) (West 2010). A complaint cannot be amended after final judgment in order to add new claims and theories or to correct other deficiencies." (Emphasis in original.) *Tomm's Redemption*, 2014 IL App (1st) 131005, ¶ 14.

¶ 198    Defendants argue that amendment under section 2-616(c) is not applicable because substituting Keita as Sissoko's heir in the complaint would not conform the pleadings to the proof elicited at trial, since there was no mention of Sissoko's marital status at trial. However, Keita argues that the complaint should be amended to conform the pleadings to the proof *elicited in posttrial discovery*, namely, proof of his status as Sissoko's husband, and argues that section 2-616(c) does not contain the words "at trial" after "proofs." While this is an interesting question of statutory interpretation, in the case at bar, we have no need to answer this question due to the posture of the case before us. Here, the trial court had already determined that the judgment as to liability would be vacated, a decision we affirm on appeal, meaning that if Keita was permitted his amendment, it would result in the need for an entirely new trial. Thus, it is

---

[18]Keita did not file an intervenor's complaint, but only filed a motion to vacate the damages portion of the judgment and to remove Bangaly as the administrator of Sissoko's estate.

clear that the instant case is not the typical one in which amendment under section 2-616(c) would conform the pleadings to the proof in an already-completed proceeding. Instead, by vacating the entire judgment, the trial court essentially rewound the case to the pretrial stage, a point at which amendments "may be allowed on just and reasonable terms." 735 ILCS 5/2-616(a) (West 2010). Thus, we consider the denial of Keita's amendment in that light.

¶ 199    "A trial court decision to deny leave to file an amended complaint will not be disturbed absent a clear abuse of discretion." *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 494 (1995). "A court abuses its discretion if allowing the amendment furthers the ends of justice." *W.E. Erickson Construction, Inc. v. Chicago Title Insurance Co.*, 266 Ill. App. 3d 905, 911 (1994).

¶ 200    " '[T]he factors which are to be considered in reviewing the propriety of the denial of a motion to amend the pleadings include (1) whether the proposed amendment would cure the defective pleading; (2) whether the proposed amendment would cause prejudice or surprise to the defendant; (3) the timeliness of the proposed amendment; and (4) whether previous opportunities to amend the pleadings could be identified.' " *Zubi v. Acceptance Indemnity Insurance Co.*, 323 Ill. App. 3d 28, 40 (2001) (quoting *Kennedy v. King*, 252 Ill. App. 3d 52, 55 (1993)); see also *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). "However, the primary consideration is whether amendment would further the ends of justice." *Regas v. Associated Radiologists, Ltd.*, 230 Ill. App. 3d 959, 968 (1992); see also *Cantrell v. Wendling*, 249 Ill. App. 3d 1093, 1095 (1993) ("The most important question is whether amendment will be in furtherance of justice, and amendment of defective pleadings should be permitted unless it is clear that the defect cannot be cured thereby. Any doubts should be resolved in favor of allowing amendments."). In the case at bar, we find that amendment would further the ends of justice, and so the trial court abused its discretion in denying Keita's request to amend the complaint.

¶ 201    In the case at bar, the trial court listed two bases for its decision to deny Keita's request to amend the complaint: it found that "[h]is inattentiveness is inexcusable and on its own face would justify this Court's determination," and it also "made formal findings of fraud against both families here." We do not find that either basis supports the denial of Keita's request to amend.

¶ 202    With regard to the issue of timeliness, we first note that timeliness is only one of the factors that must be considered in deciding whether to permit the amendment of a pleading. See *Loyola Academy*, 146 Ill. 2d at 273; *Zubi*, 323 Ill. App. 3d at 40. Thus, we cannot agree with the trial court that Keita's "inattentiveness is inexcusable and on its own face would justify this Court's determination." See *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 353 Ill. App. 3d 197, 215 (2004) ("[T]here is no indication in the case law that any one of the four factors is dispositive. Indeed, 'the primary consideration is whether [the] amendment would further the ends of justice.' " (quoting *Regas*, 230 Ill. App. 3d at 968)), *rev'd in part on other grounds*, 222 Ill. 2d 218 (2006).

¶ 203    Furthermore, while there is no question that Keita was not involved in the instant case at the time of trial, Keita's actions are explained by the record and the trial court's characterization of "intentional[ ]" and "knowing[ ]" latency requires drawing several inferences against Keita that are simply not supported by the record. It is important to bear in mind that it is undisputed that Keita was an illiterate taxi driver with five years' formal education who lived in New York, not Chicago. We also note that Keita required the use of a

Malinke interpreter in order to testify at his deposition and testified that he only spoke "[a] little bit" of English and normally spoke Malinke.

¶ 204    At his deposition, Keita explained that he was aware of Sissoko's death shortly after the accident in 2007 and that, after her death, he asked a friend to look for a lawyer and to contact him "so even if I don't go they could put my name on the case." An attorney was obtained, but Keita heard "that Sylla say Hawa was not married," and the first case eventually was "drop[ped]."[19] Keita asked Thera to look for a new lawyer, and when a second lawyer was obtained, "Thera told Sylla when he was introducing the case to call me and he going to put my name on the case. And he told Thera–he told Thera Hawa was married, then she got divorced." When Keita learned that people were saying Sissoko was divorced, he and Thera went to visit Bangaly's attorney, Lawrence Ruder, to prove that Keita and Sissoko were married. Ruder informed him that "[h]e changed the case to put [Keita's] name on it," but that later, "after he said that there was a divorce paper, it came after, he says he's no longer going to consider me part of the case." Thus, Keita's deposition testimony demonstrates that Keita attempted to keep informed of the developments of the lawsuits involving Sissoko's death from New York, belying the trial court's statement that "he remain[ed] latent intentionally for some reason, knowingly." We also note that Thera testified in his deposition that he did not inform Keita that there was a trial in Sissoko's case and did not contact him after the jury verdict.

¶ 205    Additionally, the trial court indicated that Keita, "[f]or the first time, *** [was] standing up to vindicate [Sissoko's] rights" when he sought intervention in August 2012, and commented that it was "strange and odd that he only does that when the Plaintiff's position changes in July, and they abandon the divorce decree." However, Keita involved himself with the case prior to his August 2012 motion to intervene. At a May 15, 2012, status hearing, defendants' counsel informed the court that he had been in contact with Keita's attorney in New York, who wished to meet with defendants and Bangaly for a settlement conference. Additionally, Keita appeared for his evidence deposition in June 2012 and disputed the validity of the "divorce paper." Notably, Keita's deposition occurred a month prior to the July 24, 2012, deposition of Thera, at which Bangaly's counsel confirmed that the divorce decree was no longer at issue and the sole issue was the validity of the marriage. Thus, we cannot agree with the trial court that Keita's actions demonstrated a purposeful latency that supports denying him leave to amend the complaint.

¶ 206    Additionally, the court "made formal findings of fraud" against Keita, the Sissokos, and Bangaly, finding that "[t]hey arranged a marriage, and they arranged a fraud." "Fraud consists of the misrepresentation of material facts or, under some circumstances, the failure to disclose facts." (Emphasis omitted.) *McCarthy v. Pointer*, 2013 IL App (1st) 121688, ¶ 17. " 'A misrepresentation in order to constitute a fraud must consist of a statement of material fact, false and known to be so by the party making it, made to induce the other party to act, and, in acting, the other party must rely on the truth of the statement.' " *McCarthy*, 2013 IL App (1st) 121688, ¶ 17 (quoting *Roth v. Roth*, 45 Ill. 2d 19, 23 (1970)). Fraud must be proven by clear and convincing evidence. *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005). "The clear and convincing standard requires proof greater than a

_____

[19]The "first case" referred to is presumably the complaint filed in Indiana state court, which was voluntarily dismissed.

preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362 (2004); *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995).

¶ 207    In the case at bar, we can find no support in the record for the trial court's conclusion that Keita was involved in a fraud, much less clear and convincing evidence. While we have no need to consider the propriety of the court's findings as to the Sissokos, even assuming *arguendo* that the trial court properly found a fraud with regard to them, there is no evidence in the record to connect Keita with that fraud. The court's conclusion that Keita was involved was based on three things: (1) Keita's garnering of "a portion of the $4.25 million judgment in some private arrangement, which might be quantifiable with a 35 percent that Thera said [Thera] was getting"; (2) a statement by Sissoko's father to Thera to " 'Ask Keita. He knows stuff,' words to that effect"; and (3) "most tellingly[,] that Mr. Keita only arises within days of the abandonment of the divorce decree, when it's clear that Hawa's family, in order to maintain whatever private interest they had in this statutory right, was now assailing the 14-year-old marriage, and they were doing so outwardly."

¶ 208    First, as noted, Keita did not "only arise[ ] within days of the abandonment of the divorce decree" and instead was involved with the case at least two months before it was abandoned in July 2012. Next, Thera testified that he asked Sissoko's family for 35% of whatever they recovered from the lawsuit, but never testified that any portion of that money was intended for Keita. Indeed, there was no testimony or evidence presented that Keita had any sort of private arrangement to recover anything from the family's lawsuit. Thus, the court's statement about a "private arrangement," which "might be quantifiable [at] 35 percent" is pure speculation. Finally, even if Thera's statement that Sissoko's father told him to "ask Keita" about the divorce was slightly suspicious to the trial court, this vague, suspicious statement alone could not support a finding of fraud on the part of Keita. In short, there was no way that the trial court could have properly found that Keita had committed fraud by clear and convincing evidence, and its finding cannot support its denial of Keita's request to amend the complaint.

¶ 209    In the case at bar, there is no question that Keita's proposed amendment would cure the defective pleading. As we explained above, the complaint was properly dismissed because it did not make any mention of any individual entitled to recover under the Wrongful Death Act. However, Keita's proposed amendment would substitute his name for those of Sissoko's parents and siblings as the lawful heir of Sissoko's estate and, accordingly, would cure that defect. Furthermore, "the materiality of the amendment is apparent and denial thereof would work a substantial injustice." *Loyola Academy*, 146 Ill. 2d at 274-75. While defendants would be prejudiced by undergoing a new trial, that prejudice is not the fault of Keita. In considering whether amendment should be allowed, "the primary consideration is whether amendment would further the ends of justice." *Regas*, 230 Ill. App. 3d at 968. Here, permitting Keita to seek relief for his wife's death, as he is entitled to do under the Wrongful Death Act, would further the ends of justice. Accordingly, we find that the trial court abused its discretion in denying Keita's request to amend the complaint.

¶ 210    Defendants claim that denial of leave to amend was proper because amendment would have been futile, as the amended complaint would have been time-barred under the two-year statute of limitations applicable to actions under the Wrongful Death Act. See 740 ILCS 180/2 (West 2006) ("Every such action shall be commenced within 2 years after the death of such person ***."). We do not find this argument persuasive, as we agree with Keita that the amended complaint would relate back to the original filing of the suit.

¶ 211     Under section 2-616(b), the cause of action set forth in an amended pleading is not time-barred "if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted[ ] *** grew out of the same transaction or occurrence set up in the original pleading." 735 ILCS 5/2-616(b) (West 2010). Instead, "an amendment to any pleading shall be held to relate back to the date of the filing of the original pleading so amended." 735 ILCS 5/2-616(b) (West 2010). "This section thus permits the relation back of an amended pleading to avoid the impact of statutes of limitations if two requirements are met: (1) the original pleading was timely filed and (2) the original and amended pleadings indicate that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading." *Zeh v. Wheeler*, 111 Ill. 2d 266, 270-71 (1986); see also *Santiago v. E.W. Bliss Co.*, 2012 IL 111792, ¶ 26.

¶ 212     In the case at bar, there is no dispute that Bangaly's original complaint was filed with the two-year statute of limitations period. Thus, the only issue is whether the cause of action asserted in the amended complaint grew out of the same transaction or occurrence set forth in the original complaint.

¶ 213     In *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88 (1995), our supreme court was presented with a situation not dissimilar from that present in the case at bar, and we find its reasoning instructive. There, a wrongful death complaint was filed on behalf of the decedent's "next of kin" without specifying the next of kin. *Boatmen's*, 167 Ill. 2d at 91. The complaint was subsequently amended to name the decedent's parents as her next of kin. *Boatmen's*, 167 Ill. 2d at 91. However, discovery revealed that the decedent was married at the time of her death, and, therefore, the decedent's parents were not her next of kin within the meaning of the Wrongful Death Act. *Boatmen's*, 167 Ill. 2d at 91. The complaint was again amended several times, with a combination of the parents and the decedent's husband variously listed as next of kin. *Boatmen's*, 167 Ill. 2d at 92-96. Finally, a ninth-amended complaint was filed, naming only the decedent's husband as her next of kin; although the ninth-amended complaint was filed more than two years after the decedent's death, the trial court found that the amended complaint related back to the date of the filing of the original complaint. *Boatmen's*, 167 Ill. 2d at 96.

¶ 214     On appeal, our supreme court affirmed the trial court's decision and agreed that the filing of the ninth-amended complaint related back to the date of filing of the original complaint. The supreme court noted that "[t]he purpose of [section 2-616(b)'s] relation back provision has been construed as the preservation of causes of action, including those brought under the [Wrongful Death] Act, against loss by reason of technical rules of pleading." *Boatmen's*, 167 Ill. 2d at 102. The court instructed that, "[t]o further this purpose, courts should liberally construe the requirements of section 2-616(b) in order to allow the resolution of litigation on the merits and to avoid elevating questions of form over substance." *Boatmen's*, 167 Ill. 2d at 102.

¶ 215     Our supreme court also discussed the rationale behind the "same transaction or occurrence rule," stating that the rationale "is that a defendant will not be prejudiced by an amendment so long as 'his attention was directed, within the time prescribed or limited, to the facts that form the basis of the claim asserted against him.' " *Boatmen's*, 167 Ill. 2d at 102 (quoting *Simmons v. Hendricks*, 32 Ill. 2d 489, 495 (1965)). Finally, the court indicated that "the right to amend and the relation back of an amendment depend on whether the original complaint furnished to

the defendant all the information necessary for him to prepare a defense to the claim subsequently asserted in the amended complaint." (Internal quotation marks omitted.) *Boatmen's*, 167 Ill. 2d at 102.

¶ 216    In considering the facts before it, the supreme court concluded that the ninth-amended complaint related back to the filing of the original complaint. The court found:

"Here, the original complaint informed defendant of the nature of the underlying cause of action and the basis on which liability was predicated. The original complaint was brought on behalf of decedent's 'next of kin,' thereby putting defendants on notice of the survival of a class of beneficiaries who could recover under the [Wrongful Death] Act. The sole beneficiary named in the final amended complaint was [the husband], who was decedent's 'next of kin.' Moreover, the amendment did not change the nature of the suit, which was for the wrongful death of decedent. We therefore find that the subsequent amendment of the complaint to assert that [the husband] was the sole beneficiary under the [Wrongful Death] Act grew out of the same transaction or occurrence set out in the original complaint and consequently related back to the filing of the original complaint." *Boatmen's*, 167 Ill. 2d at 105.

¶ 217    In the case at bar, as in *Boatmen's*, we find that the amendment naming Keita as heir grew out of the same transaction or occurrence set out in the original complaint naming Sissoko's parents and siblings as heirs. While the original complaint was not as broad as *Boatmen's* listing of "next of kin," the complaint in the case at bar alleged the existence of "lawful heirs of the Estate of HAWA SISSOKO." Thus, while they were the *wrong* "lawful heirs," defendants were nevertheless apprised of the existence of a class of beneficiaries who could recover under the Wrongful Death Act. Additionally, the nature of the suit, namely, a cause of action for the wrongful death of Sissoko due to the negligence of Baggiani, is identical in both the original and proposed amended complaints. The sole difference between the two complaints is the substitution of Keita's name as Sissoko's heir. All of the remaining factual allegations remain the same. Thus, "the original complaint furnished to the defendant all the information necessary for him to prepare a defense to the claim subsequently asserted in the amended complaint." (Internal quotation marks omitted.) *Boatmen's*, 167 Ill. 2d at 102. Accordingly, the amended complaint relates back to the date of the filing of the original complaint.

¶ 218    We are unpersuaded by defendants' attempts to distinguish *Boatmen's* based in part on the fact that the supreme court noted that "defendants are not prejudiced by this ruling because they were aware of [the husband's] existence prior to the expiration of the statute of limitations." *Boatmen's*, 167 Ill. 2d at 105. The supreme court's statement was additional support for its already-explained conclusion that the amended complaint related back and was not a part of its holding in that case. See *Boatmen's*, 167 Ill. 2d at 105. Thus, the absence of that factual similarity in the case at bar does not diminish the applicability of that case to the situation present here.

¶ 219    We also are unpersuaded by defendants' attempts to draw an analogy between this case and that of *Zeh*, 111 Ill. 2d 266. In *Zeh*, our supreme court found that, in a slip-and-fall case, an amendment to change the address at which the injury occurred did not relate back to the original complaint because the amended complaint set forth a cause of action that grew out of a different occurrence from that alleged in the original complaint. *Zeh*, 111 Ill. 2d at 277. The court in *Zeh* noted that "plaintiff's original pleading and amendment here described two different locations. Two different properties with different ownership were described in the

complaint and the amendment." *Zeh*, 111 Ill. 2d at 277. The situation present in that case is a far cry from that in the case at bar. While there, the underlying facts changed, here, everything remains exactly the same other than the individual entitled to recover under the Wrongful Death Act.

¶ 220    In the case at bar, the trial court should have permitted Keita to amend the complaint to list him as the sole heir of Sissoko's estate because doing so would further the ends of justice. Accordingly, we find that the trial court abused its discretion in denying Keita's request to amend the complaint.

¶ 221                                          CONCLUSION

¶ 222    We find, with regard to Bangaly's appeals: (1) the trial court did not abuse its discretion in permitting posttrial discovery on the status of Sissoko's marriage; (2) the trial court did not abuse its discretion in admitting Awad's testimony and limiting Wing's testimony; (3) the trial court's rulings that defendants had rebutted the presumption of heirship and that Keita was Sissoko's sole heir were not against the manifest weight of the evidence; and (4) the trial court did not err in dismissing the case with prejudice.

¶ 223    With regard to Keita's appeal we find: (1) the trial court did not err in vacating the judgment as to liability as well as damages; and (2) the trial court abused its discretion in denying Keita leave to amend the complaint.

¶ 224    Affirmed in part and reversed in part; cause remanded.